UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| [UNDER SEAL], | Case No. 19-CV-00007-CJW-KEM |
| Plaintiff, | AMENDED COMPLAINT |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | |

**JURY TRIAL DEMANDED**

**DOCUMENT TO BE KEPT UNDER SEAL**

Nola J. Hitchcock Cross
Cross Law Firm, S.C.
Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055
Email: njhcross@crosslawfirm.com
Attorneys for [under seal]


Angela Campbell
Dickey & Campbell Law Firm, P.L.C.
301 E Walnut Street, Suite 1
Des Moines, IA 50309
Phone: (515) 288-5008
Fax:    (515) 288-5010
Email: angela@dickeycampbell.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES of AMERICA, *ex rel.*
RICHARD REZKO,

STATE OF IOWA,
*ex rel.* RICHARD REZKO,

          and

RICHARD REZKO,

          Plaintiffs and Relator,

   v.

UNIVERSITY OF IOWA HEALTH SYSTEM,

KENJIROU OHASHI,

D. LEE BENNETT,

NOBUHIRO FUJITA,

JACK KADEMIAN,

BRUNO POLICENI,

JOAN MALEY,

BRIAN F. MULLAN,

TAKAHASHI S. SATO,

and

LEONEL VASQUEZ,

          Defendants.

**FIRST AMENDED FALSE CLAIMS ACT COMPLAINT**

## Table of Contents

I. INTRODUCTION TO THE FALSE CLAIMS .................................................................. 5

II. STATEMENT OF THE CASE ...................................................................................... 10

III. FEDERAL JURISDICTION AND VENUE ................................................................... 12

IV. PARTIES ..................................................................................................................... 13

    A. Relator ................................................................................................................... 13

    B. Government Plaintiffs ............................................................................................ 13

    C. Corporate Defendants ............................................................................................ 14

    D. Individual Defendants ........................................................................................... 14

    1. Radiology Department Leadership ......................................................................... 14

    2. Prolific Batch Signers ............................................................................................ 15

V. GENERAL FACTUAL BACKGROUND ....................................................................... 15

VI. APPLICABLE LEGAL AUTHORITY .......................................................................... 18

    A. False Claims Act .................................................................................................... 18

    B. Iowa False Claims Act ........................................................................................... 20

    C. The Medicare and Medicaid Program's Payment of Claims for Services Provided by Resident Radiologists and Teaching Physicians ......................................................... 20

        1. The Medicare and Medicaid Enrollment Process, Participation Requirements, and Provider Agreements ............................................................. 22

        2. Medicare Submission of Certified Claims for Payment ........................... 25

        3. Conditions for Payment on a Fee Schedule Basis for Physician Services in a Teaching Setting ............................................................................................ 27

        4. Government Payment for Graduate Medical Education Provided by Teaching Hospitals to New Physicians-in-Training as Fellows and Residents ... 28

        a. Residency Program Funding and Regulatory Framework ...................... 29

        b. Payment for Residency Training Services .................................................. 32

VII. FACTUAL BACKGROUND ......................................................................................... 35

    A. Relator Richard Rezko ........................................................................................... 35

    B. UIHC's Financial Situation Incentivizing Fraud ................................................. 36

    C. Defendant UIHC's Organizational Structure ........................................................ 37

    D. Defendant UIHC's Radiology Department's Operational Structure ..................... 38

VIII. DEFENDANTS' FALSE CLAIMS CONDUCT ........................................................... 40

    A. Defendants' Schemes for Presenting False Claims ............................................... 40

B.  Defendant UIHC's  X-Ray Overbilling Scheme ....................................... 41

C.  Defendant UIHC's Long Leg View Scheme ............................................ 46

D.  Defendant UIHC's Myeloma MRI Scheme ............................................ 49

E.  Defendant UIHC's Useless 3-D Reconstruction Scheme ....................... 54

F.  Defendant UIHC's Batch Signing Supervision Scheme ......................... 63

G.  Defendant's Unsupervised Spinal Tap Scheme .................................... 83

IX.  COUNTS .......................................................................................... 87

COUNT ONE  Violations of the Federal False Claims Act   31 U.S.C. § 3729(a)(1)(A)
Defendant's Comparison X-Ray Scheme: False Claims for "Comparison" Radiology
Services not Ordered or Medically Indicated ................................................ 87

COUNT TWO  Violations of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)
Defendants' Long Leg View Scheme: False Claims for Diagnostic Imaging Services
for Femur and Tibia-Fibula Not Actually Provided ........................................ 88

COUNT THREE  Violations of the Federal False Claims Act 31 U.S.C. §
3729(a)(1)(A) Defendants Myeloma MRI Scheme: False Claims for Payments for
Diagnostic MRI Services Not Actually Provided to Cancer Patients ........................ 89

COUNT FOUR  Violations of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)
Defendants Useless 3-D Reconstruction Scheme: False Claims for Payments for
Diagnostic 3-D Reconstruction Interpretations Not Actually Provided ..................... 90

COUNT FIVE  Violations of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)
Defendants' Batch Signing Scheme: False Claims for Payments for Services
Rendered by Unsupervised Radiology Residents as if Rendered by
Attending/Teaching Physicians ................................................................. 91

COUNT SIX  Violations of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)
Defendant UIHC's Unsupervised Spinal Tap Scheme: False Claims for Services
Rendered by Fellows as if Rendered by Attending/Teaching Physicians ................... 92

COUNT SEVEN  Violations of the Federal False Claims Act 31 U.S.C. §
3729(a)(1)(A) False Claims for Graduate Medical Education for Unsupervised
Radiology Residents and Neuroradiology Fellows ........................................... 93

COUNT EIGHT  Violations of the Iowa False Claims Act Iowa Code Ann. §§ 685.1-
.7 False Claims for Payments for Unsupervised Resident Radiologist Services ......... 94

COUNT NINE  False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Defendants' Falsification
of Medical Records, Billing Records, and Cost Reports in Support of False Claims  95

COUNT TEN False Claims Act, 31 U.S.C. § 3729(a)(1)(G) Improper Retention of
Government Health Plan Overpayment / Reverse False Claim ................................. 95

X.  PRAYER FOR RELIEF ..................................................................... 96

NOW COMES Relator Richard Rezko, through his attorneys, Cross Law Firm, S.C., by Nola J. Hitchcock Cross; and local counsel Dickey & Campbell Law Firm P.L.C, by Angela Campbell, who states that this is an action brought on behalf of the United States of America and the State of Iowa, against Defendant University of Iowa Health System d/b/a University of Iowa Hospital and Clinics (**UIHC**); the leaders of its Department of Radiology and Radiology Fellowship, **Kenjirou Ohashi, D. Lee Bennett, and Bruno Policeni;** and Attending/Teaching Physicians in its Department of Radiology, **Nobuhiro Fujita, Jack Kademian, Joan Maley, Brian Mullan, Takahashi S. Sato, and Leonel Vasquez**, pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and the Iowa False Claims Act, Iowa Code Ann. §§ 685.1-7, for knowingly submitting or causing the submission of false claims for payment to the United States of America and the State of Iowa; and for knowingly failing to repay payments which Defendants received from the government, but to which Defendants were not entitled. Relator also brings this action on behalf of himself to obtain a Relator share of the damages to the United States and State of Iowa.

As and for his allegations against Defendants, Relator Richard Rezko states as follows:

## I.      INTRODUCTION TO THE FALSE CLAIMS

1.      Following the "it's free money, just do it" rationale cited by Lead Technician Mark Nicklaus during a May 24, 2019 discussion with Relator, Defendants University of Iowa Health Systems and radiologists Kenjirou Ohashi and D. Lee Bennett have concocted, maintained, and enforced—and Defendant Attending/Teaching Physicians have implemented— schemes to bill the federal and Iowa state governments for millions of dollars of medical services that they did not provide at all; that they did not reasonably provide in a useful or medically indicated manner; or that were supported by false and misleading medical and billing

documentation in order to ensure payment. All of which were paid for by the Government and not returned to the Government by Defendants, even after Defendants learned of the false claims.

2.      Defendant University of Iowa Health Systems maintains eight schemes to bilk Government healthcare plans, including Medicare, Medicaid, Tri-Care, and other government healthcare programs, by:

> (1) billing the Government for "comparison" radiograph (X-ray) imaging diagnostic radiology services that are neither used to render a diagnosis nor medically indicated, hereinafter referred to as the "**X-Ray Comparison Scheme**;"

> (2) billing the Government for tibia and fibula radiograph (X-ray) imaging diagnostic radiology services that were not actually provided, hereinafter referred to as the "**Long Leg View Scheme**;"

> (3) billing the Government for multiple myeloma cancer magnetic resonance imaging (MRI) diagnostic radiology services that were not actually provided, hereinafter referred to as the "**Myeloma MRI Scheme**;"

> (4) billing the Government for useless post-diagnosis and/or post-operative multi-planar ("3-D") reconstruction of computed tomography (CT) imaging diagnostic radiology services falsely "merged" with original "2-D" CT services in patients' medical records to appear as if they had been timely performed and used to render the diagnosis, hereinafter referred to as the "**Unused 3-D Reconstruction Scheme**;"

> (5) billing the Government for Lumbar Puncture procedures performed by Neuroradiology Fellows without a required Attending/Teaching Physician present

during any portion of the procedure, hereinafter referred to as "**Unsupervised**

**Spinal Tap Scheme**;"

(6) billing the Government for diagnostic radiology services as if they had been

provided by fully qualified Attending/Teaching Physicians, when in reality the

services were provided by unsupervised student Residents and then "batch-

signed" for billing purposes only, without any actual review or exercise of

medical judgment, hereinafter referred to as the "**Batch Signing Scheme**;"

(7) retaining the payments obtained as a result of its above schemes, despite knowing

that each payment constituted an overpayment, hereinafter referred to as

"**Payment Retention Scheme**;" and

(8) falsifying medical records and billing documentation to facilitate their above

schemes (1) through (7), hereinafter referred to as "**Falsification Scheme**."

3. The **X-Ray Comparison** and **Long Leg X-Ray Schemes** are pervasive,

straightforward schemes that result in Defendant UIHC billing dozens of invoices or "claims"

*per week* to Government healthcare plans for bogus diagnostic radiology services that were never

actually provided.

4. Similarly, in its **Myeloma MRI Scheme,** Defendant UIHC submits false claims to the

Government for double the amount of magnetic resonance imaging (MRI) services actually

provided when conducting cursory bone marrow screenings for multiple myeloma, an extremely

rare form of cancer. Because the cursory screenings are not independently billable, Defendant

UIHC falsely bills the government as if the screening were a comprehensive, full-body

diagnostic MRI exam.

5. As its **Unused 3-D Reconstruction Scheme**, Defendant UIHC systematically

submits false claims for the review and interpretation of 3-D Reconstructions, a type of imaging

involving software-generated, three-dimensionally reformatted images captured during a

Computer Tomography (CT) scan. Although billed and documented as being medically

necessary for *preoperative* and *diagnostic* purposes, Defendant UIHC radiologists in fact never

"interpret" the 3-D reconstructions until *after* a procedure and/or diagnosis has already been

completed and rendered.

6.      Beginning by at least 2012, Defendant UIHC, through its staff radiologists

including Defendant Attending/Teaching Physicians, as a result of the direction and/or reckless

disregard of Defendant Drs. D. Lee Bennett and Kenjirou Ohashi, commenced its **Unsupervised**

**Spinal Tap Scheme** to fraudulently enhance revenues by assigning its 30 or so Medicare-funded

Radiology "Residents," who are just beginning their post-graduate medical training, to act in

place of UIHC's faculty Radiologists in order to maximize revenues despite risking patient harm.

7.      Rather than supervising, reviewing, and approving the diagnostic radiology

services of its Radiology Residents and then billing for their own, independent exercise of

medical judgement as Attending/Teaching Physicians, Defendant UIHC's staff radiologists,

including Defendants' Attending/Teaching Physicians, not only leave Residents with no direct

supervision but also disregard 42 C.F.R. § 415.180's express condition of payment by eschewing

any independent review and interpretation of  Residents' "preliminary reports."  Instead,

Defendants' **Batch-Signing Scheme** avoids any review or interpretation whatsoever in favor of

rapid-fire signing of dozens of reports within a matter of a minute or so, solely in order to falsely

bill the government for "interpretations" that never took place.

8.      The fraudulent **Batch Signing Scheme** to submit claims for radiograph ("X-ray")

image interpretation services provided by unsupervised Radiology Residents during lengthy on-

call shifts, was, based on Relator's observation of and experience interacting with longtime

Attending/Teaching Physicians, in place no later than 2012 and is routinely engaged in by

Attending/Teaching Physicians throughout all nine (9) of Defendant UIHC's Radiology

Department's specialty divisions.

9.       The Batch Signing Scheme allows Defendant to bill for services rendered by

Resident Radiologists during 12 to 15-hour "on-call" shifts, during which Radiology Residents

are left alone in the UIHC Radiology Department's "reading room" where they receive and

interpret diagnostic images—primarily X-rays but also cross-sectional exams such MRI, CT, and

ultrasound—sent from providers hospital-wide but most often (given the time) from the

Emergency Department.

10.      In Defendant UIHC's Department of Radiology Resident Program, neither the

supervision nor the required independent review and approval review occurs. Nevertheless,

Defendant UIHC fraudulently obtains payments from the Government for Attending/Teaching

Physicians' services merely by falsifying records and, at the same time, capturing the cost-saving

benefits and Medicare funding respectively associated with hosting a Resident program.

11.      After observing a patient leaving the hospital because of an undetected bone

infection, as well as another patient nearly becoming paralyzed due to an undiagnosed spinal

tumor missed by on-call Radiology Residents, Relator, a Fellow in the Musculoskeletal ("MSK")

Division of Defendant UIHC's Department of Radiology, sought permission to at least be

allowed to consult with the Radiology Resident or to review the interpretations conducted by

Residents during the long, arduous, overnight, "on-call" shift.

12.      As described below, Relator's request was denied, and Defendant UIHC's

Residency Program Director, Defendant Dr. Bruno Policeni, responded to Relator's concerns by

directing him not to "*bother*" the Residents with actual supervision because it "*slows them down*."

13.     About half or more of the radiology services performed at UIHC are for Government Beneficiaries and billed to Government health plans.

14.     For each of the eight Schemes, Defendants' motivation is simple. Defendant UIHC's compensation structure rewards Attending/Teaching Physicians in its Department of Radiology for high volume, i.e. interpretation of as many diagnostic images as possible, at the highest reimbursement rate possible. Each of the schemes above allows Defendant UIHC and the Attending/Teaching Physicians of its Radiology Department to obtain more money.

15.     The lack of supervision and independent review throughout these schemes creates a significant risk of patient harm. Relator observed a "miss rate" of nearly 50%, with Residents routinely failing to identify life-threatening conditions, from tumors and bone infections, to spinal fractures and hematomas.

## II.     <u>STATEMENT OF THE CASE</u>

16.     Relator Richard Rezko, M.D., brings this action on behalf of the United States of America for treble damages and civil penalties arising from Defendants' fraudulent conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and the Iowa False Claims Act, Iowa Code Ann. §§ 685.1-.7, with respect to Defendants University of Iowa Hospitals and Clinic and Attending/Teaching Physicians' schemes to submit, or cause to be submitted, false claims to and paid for by the Government's healthcare programs, including Medicare, Medicaid, Tri-Care, and other government healthcare plans, for diagnostic radiology

services rendered, or purportedly rendered, at the University of Iowa Hospital in Iowa City, Iowa.

17.     This is a *qui tam* action against Defendants to recover damages and civil penalties on behalf of the United States of America and the State of Iowa arising from the false and/or fraudulent records, statements, and claims made or caused to be made for payment for services not provided and for services rendered by unsupervised Fellows and Residents in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and Iowa False Claims Act, Iowa Code Ann. §§ 685.1-7.

18.     As introduced in part I above and described in detail below, from at least September 2012 to the present and continuing, Defendant UIHC, through its Department of Radiology, engaged in and continues to engage in a scheme to create false records and to cause the submission of false claims to Government healthcare programs for payment for diagnostic radiology services that were (1) not provided in the amount or manner billed; (2) medically unnecessary, unindicated, and/or useless or unused; or (3) provided by unsupervised Residents and Fellows and thus ineligible for Government payment under 42 C.F.R. §§ 415.170, 415.172, and 415.180.

19.     Defendant Drs. Bennett and Ohashi are not only aware of each scheme, but have personally and intentionally overbilled or caused overbilling for the first five schemes listed above: the (1) X-Ray Comparison Scheme; (2) Long Leg View Scheme; (3) Myeloma MRI Scheme; (4) Unused 3-D Reconstruction Scheme; and (5) Unsupervised Spinal Tab Scheme.

20.     While Defendant Drs. Bennett and Ohashi further the sixth billing scheme, Batch Signing, by recklessly disregarding the rampant rubber stamping of Resident

Radiologists' reports billed as if directly supervised and reviewed by Attending/Teaching

Physicians, without regard for Medicare's express conditions of payment, the

Attending/Teaching Physicians directly engaged in the batch signing are Defendant Drs.

Fujita, Policeni, Kademian, Maley, Muller, Sato, and Vasquez.

21.     Each instance of the billing and document falsification referenced above

constitutes a separate and distinct false claim under both the False Claims Act, 31 U.S.C.

§§ 3729, *et seq*. ("FCA"), and Iowa False Claims Act, Iowa Code Ann. §§ 685.1-7.


## III.     FEDERAL JURISDICTION AND VENUE

22.     The acts prohibited by 31 U.S.C. §§ 3729 *et seq*. and set forth with particularity

herein occurred in and around Iowa City, Iowa, with many Beneficiaries in the Northern District

of Iowa. Therefore, the court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) as

well as under 28 U.S.C. § 1345. This court has supplemental jurisdiction over this case for the

claims brought on behalf of the State of Iowa pursuant to 31 U.S.C. § 3732(b) and/or 28

U.S.C. § 1367, inasmuch as recovery is sought on behalf of the United States.

23.     Venue is proper in the Northern District of Iowa pursuant to 31 U.S.C. § 3732(a),

and 28 U.S.C. § 1391(b) and (c), because the Defendants transact business in this District and

one or more of the acts committed by the Defendants and prosecuted by 31 U.S.C. § 3729

occurred in this District. Specifically, Defendant regularly treats Beneficiaries of Government

healthcare programs who reside in this District.

24.     Relator previously provided notice and evidence of this matter to the office of the

United States Attorney for Northern Iowa and provides to the Attorney General of the United

States and the Attorney General for the State of Iowa all material evidence and information

related to the Complaint pursuant to 31 U.S.C. § 3730(b)(2) and Iowa Code Ann. § 685.3.2(b).

## IV.    PARTIES

### A.  Relator

25.    Relator, Richard Rezko, is a citizen of the United States of America and a resident

of the City of Iowa City, State of Iowa. Rezko was employed by the University of Iowa Health

System as a Musculoskeletal Radiology Fellow in UIHC's Department of Radiology and he is

and was during all relevant times a licensed physician.

26.    Richard Rezko brings this action based upon his independent and direct personal

knowledge on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(2) and on

behalf of the State of Iowa pursuant to Iowa Code Ann. § 685.3.1(a).

### B.  Government Plaintiffs

27.    The United States of America is a sovereign country whose Department of Health

and Human Services ("HHS") pays claims submitted or caused to be submitted to it by

Defendant UW Radiology through the Medicare program and, as shared with the State of Iowa,

the Medicaid Program. Relator brings this action on behalf of the United States of America

pursuant to 31 U.S.C. § 3730(b)(1).

28.    The State of Iowa, through its Department of Public Health ("IDPH"), pays claims

submitted or caused to be submitted to it by Defendants through the state's Medical Assistance

program (hereinafter referred to as "Medicaid"). Relator brings this action on behalf of the State

of Iowa pursuant to Iowa Code Ann. § 685.3.1(a).

### C. Corporate Defendants

29.     Defendant University of Iowa Health System, d/b/a University of Iowa Health

Care is an Iowa non-profit corporation located at 200 Hawkins Drive, 1349 JCP, Iowa City,

Iowa. Its registered agent, Joseph B. Clamon, is located at the same address.

### D. Individual Defendants

#### 1. Radiology Department Leadership

30.     Defendant Kenjirou Ohashi is a citizen of the United States and a resident of the

State of Iowa, County of Johnson. He is and has been during all relevant times a licensed

physician, a radiologist, a tenured Clinical Professor of Radiology at Defendant UIHC, and a

Director of UIHC's Musculoskeletal Radiology Fellowship Program.

31.     Defendant D. Lee Bennett is a citizen of the United States and a resident of the

State of Iowa, County of Johnson. He is and has been during all relevant times a licensed

physician, a radiologist, a tenured Clinical Professor of Radiology at Defendant UIHC, a

Director of the Musculoskeletal Radiology Section, and Vice Chair of Clinical Affairs for

UIHC's Department of Radiology.

32.     Defendant Bruno Policeni is a citizen of the United States and a resident of the

State of Iowa, County of Johnson. He is and has been during all relevant times a licensed

physician, a radiologist, a tenured Clinical Professor of Radiology at Defendant UIHC, the

director of UIHC's Radiology Residency Program, a Director of UIHC's Musculoskeletal

Radiology and Neuroradiology Fellowship Programs, and Vice Chair of Clinical Operations and

Education for UIHC's Department of Radiology.

### 2. Prolific Batch Signers

33.     Defendant Nobuhiro Fujita is a citizen of the United States and a resident of the State of Iowa, County of Johnson. He is and has been during all relevant times a licensed physician, a radiologist, and an Attending/Teaching Physician at Defendant UIHC.

34.     Defendant Jack Kademian is a citizen of the United States and a resident of the State of Iowa, County of Johnson. He is and has been during all relevant times a licensed physician, a radiologist, and an Attending/Teaching Physician at Defendant UIHC.

35.     Defendant Joan Maley is a citizen of the United States and a resident of the State of Iowa, County of Johnson. He is and has been during all relevant times a licensed physician, a radiologist, and an Attending/Teaching Physician at Defendant UIHC.

36.     Defendant Brian F. Mullan is a citizen of the United States and a resident of the State of Iowa, County of Johnson. He is and has been during all relevant times a licensed physician, a radiologist, and an Attending/Teaching Physician at Defendant UIHC.

37.     Defendant Takahashi Sato is a citizen of the United States and a resident of the State of Iowa, County of Johnson. He is and has been during all relevant times a licensed physician, a radiologist, and an Attending/Teaching Physician at Defendant UIHC.

38.     Defendant Leonel Vasquez is a citizen of the United States and a resident of the State of Iowa, County of Johnson. He is and has been during all relevant times a licensed physician, a radiologist, and an Attending/Teaching Physician at Defendant UIHC.

## V.     GENERAL FACTUAL BACKGROUND

39.     Defendant UIHC's University of Iowa Hospital is a teaching hospital. Its four-year Diagnostic Radiology Residency Program (housed within each of the nine (9) Divisions of

the UIHC Radiology Department described below) as well as the billing practices of its Attending/Teaching Physicians are the subjects of this Complaint.

40.     Radiology Residents, Fellows, and Attending/Teaching Physicians all perform diagnostic radiology professional services in Defendant UIHC's "readings rooms."

41.     Each of the nine (9) Radiology Department Divisions, described below and located throughout the hospital, includes a reading room.

42.     Each UIHC reading room contains between two and six individual "workstations" equipped with picture archiving and communication system ("PACS") technology platforms.

43.     The PACS platform electronically receives, stores, and provides radiologists access to the variety of images which they are trained and paid to interpret, including radiographs ("X-rays"), computed magnetic resonance imaging ("CT"), and magnetic resonance imaging ("MRI") scans (also called "modalities").

44.     These images are ordered by physicians in myriad specialties throughout UIHC and obtained by Radiology Technicians. For example, as a fellow in UIHC Radiology's Musculoskeletal (MSK) Division, Relator often interprets images ordered by orthopedic surgeons.

45.     Once the scans are performed and the images obtained, the images are electronically relayed, contemporaneously, to a "queue" or "in the PACS reading room workstation," which consists of three or four computer monitors.

46.     Defendant UIHC's PACS software allows radiologists to access and view only one scan's image at a time.

47.     Upon completing their review and interpretation of the images—called an "interpretation" or "impression" depending on the modality—radiologists dictate written findings. The final version of these findings is referred to as a diagnostic report or "study."

48.     Different modalities render different types of images, which are interpreted different ways. For example, a single X-ray image may require multiple "views" and an MRI scan involves multiple "sequences," as described in further detail below.

49.     The diagnostic report constitutes the "Professional Component" for most diagnostic radiology services, as described in further detail below.

50.     The diagnostic reports are then made part of the patient's medical record, or "jacket" using Epic Systems' ("Epic") electronic medical record ("EMR") software. Although accessed using a separate monitor at the workstation, Epic is electronically synchronized with PACS: Once a set of images is ready and available on the PACS platform, a new "encounter" and corresponding "accession number" is generated in Epic.

51.     Diagnostic reports are electronically "signed" by the provider and timestamped under the Chart Review and Encounter tabs of the Epic interface, respectively.  The text of the report is listed in Epic under the heading "Study Report."

52.     Upon completion of this medical record, the documentation is shared electronically via Epic to UIHC's billing department, where individual "Coders" review the Epic record; assign or review the appropriate Current Procedural Terminology (CPT) codes; and submit the claims for payment.

53.     Based on Relator's observation, the CPT codes are typically entered or reviewed by the Coders into the medical and billing record Epic database within 20 to 30 minutes of the completion of the interpretation service.

17

54.     Diagnostic reports completed by Radiology Residents during lengthy unsupervised overnight "general call" shifts are referred to as "preliminary reports."

55.     In order for the preliminary reports to become finalized, billable reports, Defendant UIHC's Attending/Teaching Physicians must review, approve, and electronically sign the reports and enter them into patients' medical record.


## VI.     APPLICABLE LEGAL AUTHORITY

### A.  False Claims Act

56.     Congress substantially amended the federal False Claims Act ("FCA"), originally enacted during the Civil War, in 1986, 2009, and 2010, to enhance the ability of the United States to recover losses it sustained as a result of its payment of fraudulent claims and to recover damages and penalties for such false claims.

57.      As a result of 1986 Congressional hearings, Congress found that false claims for payment in federal programs was pervasive and that the FCA is a primary tool for combating false claims to the government, whereupon Congress amended the Act with the intention of enhancing incentives for individuals with knowledge of false claims against the Government to disclose the information without fear of reprisals. *See generally, False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

58.     The current FCA is designed to encourage "relators" to come forward with personal information and for the private bar to commit legal resources to pursuing fraud on the Government's behalf and to create a private/public partnership to obtain recovery for false claims submitted to the Government. *See generally, False Claims Act Amendments: Hearings before the*

*Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

59.     The FCA subjects a person to liability under section 31 U.S.C. §§ 3729 *et seq.* who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F) . . . or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

60.     Under 31 U.S.C. § 3729 (b)(1), the "terms 'knowing' and 'knowingly:'"

> (A) mean that a person, with respect to information—
>
> > (i) has actual knowledge of the information;
> >
> > (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> >
> > (iii) acts in reckless disregard of the truth or falsity of the information; and;
>
> (B) requires no proof of specific intent to defraud.

61.     After a catch-up inflation increase, the range of the civil penalties has been adjusted for inflation by an annual cost-of-living-adjustment. Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015 (Section 701 of the Bipartisan Budget Act of 2015,

Public Law 114–74).

62.     For civil penalties assessed after February 3, 2017, and on or before January 29,

2018, whose associated violations occurred before November 2, 2015, the adjusted civil

penalties are assessed between $10,957 and $21,916 per violation. For civil penalties assessed

after January 29, 2018, whose associated violations occurred after November 2, 2015, the civil

monetary penalties are between $11,181 and $22,363 per violation. 28 C.F.R. § 85.5.

**B.  Iowa False Claims Act**

63.     The Iowa False Claims Act similarly imposes liability on any person who

knowingly presents, or causes or induces another person to present, a false claim to the State for

payment or approval. Iowa Code Ann. §§ 685.1-.7

64.     When a medical provider willfully submits claims for Government payment

knowing that such claims constitute false representations resulting in the payment of public

funds for which the provider is ineligible, Iowa law provides that the State is entitled to recover

treble damages plus a civil penalty within the range allowed under the federal False Claims Act

cited above. Iowa Code Ann. § 685.2.1.

**C.  The Medicare and Medicaid Program's Payment of Claims for Services Provided by
Resident Radiologists and Teaching Physicians**

65.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., enacted in 1965,

established the Health Insurance for the Aged and Disabled Program, commonly referred to as

the Medicare Program. Pursuant to the Medicare program and other government healthcare

programs described below, the government pays claims for certain medical services, including

outpatient physical therapy services, for persons age 65 and older, and for persons with

disabilities. 42 U.S.C. § 1395k(a)(2)(C).

66. Medicare pays health care providers for the reasonable costs of providing covered health services to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A).

67. Critical to the continued solvency and viability of Medicare and other Government health programs is that healthcare providers bill only for services that are actually performed, that are "reasonable," and that are medically necessary. 42 U.S.C. § 1395x(v)(1)(A).

68. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program.

69. The Center for Medicare and Medicaid Services ("CMS") is the division of HHS directly responsible for the administration of Medicare.

70. Medicare Part A provides hospital insurance benefits to the elderly and disabled, including payment of certain costs incurred by teaching hospitals for providing "graduate medical education" to Fellows and Residents. 42 U.S.C. §§ 1395c *et seq.*

71. Medicare Part B is a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program, including some physical therapy services. Payment for Medicare claims is made by the United States through CMS. In turn, CMS contracts with private insurance companies to receive, review, and pay appropriate claims for outpatient physical therapy services. 42 U.S.C. § 1395h and 42 U.S.C. § 1395u.

72. The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, Medicaid, and federal workers' compensation programs, all of which have suffered false claims at the hands of the Defendants.

73.    TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1071 *et seq*.; 32 C.F.R. § 199.4(a).

74.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781 *et seq*.; 38 C.F.R. § 17.270(a).

75.    The Medicaid Program ("Medicaid"), administered by individual states and jointly funded by State and Federal taxpayer revenue, is a health insurance program also created as part of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The federal portion of a state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's *per capita* income compared to the national average. 42 U.S.C. § 1396d(b).

76.    The Iowa Medicaid program is "Medical Assistance" and the FMAP constitutes approximately 50% of the cost of Iowa's Medical Assistance.

77.    The Federal Employees' Compensation Act provides workers' compensation coverage, including coverage of medical care received as a result of a workplace injury, to federal and postal employees.  The Act is administered by the Department of Labor, Division of Federal Employees' Compensation.  5 U.S.C. §§ 8101 *et seq*.; 20 C.F.R. §§ 10.0 *et seq*.

1.    **The Medicare and Medicaid Enrollment Process, Participation Requirements, and Provider Agreements**

78.    To participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare payments and reimbursements. 42 U.S.C. § 1395cc.

79.    For example, healthcare providers participating in the Medicare program must:

  (a) Refrain from making false statements or misrepresentations of material facts

    concerning payment requests;

  (b) Not bill for any services or products that were not performed or delivered in

    accordance with all applicable policies;

  (c) Be fully licensed and/or certified under all applicable state and federal laws to

    perform the services provided to the recipients;

  (d) Comply with the applicable state and federal statutes, policies, and

    regulations; and

  (e) Not engage in any illegal activities related to the furnishing of services or

    products to recipients.

42 U.S.C. §§ 1395 *et seq.*

  80. To contract with Medicare, healthcare providers must complete a Medicare

Enrollment Application form. "Institutional Providers," such as hospitals, nursing homes, and

hospices enroll in Medicare Part A using form CMS 855A. Outpatient "Clinics/Group Practices,"

however, enroll in Part B using CMS application form 855B while individual providers enroll in

Part B using CMS 855I.

  81. Each enrollment application form includes, as a condition of participation in the

Medicare Part B program, that providers be familiar with and abide by the program's payment

policies and make the following Certification Statement:

    (3) *I agree to abide by the Medicare laws, regulations and program
     instructions that apply to this supplier. . . . I understand that
     payment of a claim by Medicare is conditioned upon the claim and
     the underlying transaction complying with such laws, regulations
     and program instructions . . . and on the suppliers' compliance
     with all applicable conditions of participation in Medicare.*

 …

(6) *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

82.     Accordingly, Defendants had and have a legal duty to know the statute, regulations, and guidelines regarding coverage for Medicare services as a condition of participating in the program and submitting any billings to the government.

83.     Finally, in addition to their enrollment obligations, Medicare Part B providers must annually execute the Medicare Participating Physician or Supplier Agreement (CMS – 460):

> *The above named person or organization, called "the participant," hereby enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare law and regulations and which are furnished while this agreement is in effect....*

84.     The Agreement further warns that substantial failure to "comply with the agreement" will cause the Agreement to be terminated and may result in "[c]ivil and criminal penalties."

85.     Likewise, in order to participate in and receive payment from the Iowa Medical Assistance Medicaid program(s), providers must certify compliance with state laws and regulations by initialing each page of and signing a Provider Agreement.

86.     By executing the Provider Agreement, the provider certifies that he/she/it will: (a) comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services; and (b) assume full responsibility for the accuracy of claims submitted to DHS in accordance with the certification requirements of 42 C.F.R. § 455.18.

87.     At all times relevant to this action, Defendants were participating Medicare and Iowa Medical Assistance providers.

### 2.     Medicare Submission of Certified Claims for Payment

88.     To bill Medicare Part B, a provider must submit a paper form or its electronic equivalent to its regional Medicare Administrative Contractor ("MAC").

89.     A MAC is a private health care insurer that CMS has awarded a geographic jurisdiction to process Medicare claims. Generally, pursuant to rules promulgated under the 2001 Administrative Simplification Act, claims must be submitted electronically unless certain exceptions are met, in accordance with CSM, Medicare Claims Processing Manual, ch. 1, § 02.

90.     The type of claim form required to be submitted depends on the type of provider submitting the claim. Generally, institutional providers submit 837I, or its paper equivalent, CMS 1450, also known as UB-04, while claims for the services of individual health care professionals are submitted using 837P, or its paper equivalent CMS 1500, formerly known as HCFA 1500. These forms describe, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.

91.     Providers submitting 837I or CMS 1450 thereby certify that the information provided is "true, accurate and complete" and that the specific services billed on the form are "medically indicated and necessary" for the specific patient Beneficiary involved. Likewise, providers submitting 837P or CMS 1500 certify that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

92.     At all times relevant to this action, Defendant UIHC and its employees with medical licenses were participating Medicare providers, and the local carriers that reviewed and approved the claims at issue in this case based their approval on their review of the enrollment and claim information provided by UIHC and they relied on the veracity of those claims submissions when determining whether to pay such claims.

93.     Generally, claims submitted as described above for radiologist services are paid according to the Medicare Physician Fee Schedule ("PFS") established by CMS. 42 C.F.R. § 414.4. CMS has, since 1983, adopted the Current Procedural Terminology ("CPT") coding system as part of the Healthcare Common Procedure Coding System ("HCPCS") and mandated that physicians use this system to bill Medicare for their services. These codes are a systematic listing of procedures and services performed by healthcare providers and are used to describe and evaluate the services claimed for payment.

94.     Pursuant to regulations promulgated by CMS expressly implementing Section 1833 of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, for radiologists, the payment amounts for specific diagnostic procedures, such as Magnetic Resonance Image ("MRI") scans and related services by medical providers interpreting the images, are referred to respectively as the "technical component" and "professional component" of a particular CPT code corresponding to the single, overall procedure, with certain modifiers adjusting the reimbursement, depending on whether the procedure and/or services were performed inside or outside of a facility. CMS, *Medicare Claims Processing Manual*, Pub. No. 100-04, ch. 13, §§ 10 – 20.3.2; 42 C.F.R. § 413.122.

95.     Generally, the technical component is paid under Medicare Part A, while the professional component is paid under Part B.

96.     For example, for a standard MRI brain scan and interpretation, which is CPT code 70551, performed in an Iowa hospital, Medicare pays $224.43, with $151.13 as the technical component and $73.30 as the professional component.

97.     In order for a provider to bill the technical component, which is often physically carried out by a non-physician professional "technician," Medicare requires that an Attending/Teaching Physician be "immediately available to furnish assistance and direction throughout the performance of the procedure," although they need not be present in the room itself. 42 C.F.R. § 410.32(b)(3).

### 3.  Conditions for Payment on a Fee Schedule Basis for Physician Services in a Teaching Setting

98.     Under 42 C.F.R. § 415.170, Medicare pays for physician services "in a teaching setting" only if:

> a.  the "services are personally furnished by a physician who is not a resident";
>
> or
>
> b.  the "services are furnished by a resident *in the presence of a teaching physician* except as provided in § 415.172 (concerning physician fee schedule payment for services of teaching physicians), § 415.174 (concerning an exception for services furnished in hospital outpatient and certain other ambulatory settings), § 415.176 (concerning renal dialysis services), and § 415.184 (concerning psychiatric services), as applicable.

99.     Embodied in the Code of Federal Regulations at 42 C.F.R. § 415.172 (a), is the federal requirement that, as a "[g]eneral rule," "[i]f a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made *only if a teaching physician is present during the key portion of any service or procedure for which payment is sought."* (Emphasis added.)

27

100. This required level of Resident supervision is coupled with strict documentation requirements, and for a claim to be paid, the Beneficiary's "medical records must document the teaching physician was present at the time the service is furnished." 42 C.F.R. § 415.172(b).

101. Applying these rules in the specific context of diagnostic radiology's "teaching setting," 42 C.F.R. § 415.180 allows providers like UIHC to submit claims for payment for diagnostic interpretations originally completed by Residents without a physician presence present only if, thereafter, "the interpretation is performed or reviewed by a physician other than a resident" and documentation shows that the Teaching Physician "reviewed the resident's interpretation with the resident."

102. To the extent that "with the Resident" has been interpreted by accrediting bodies and others to allow for remote availability of Teaching Physicians to suffice, Defendants still do not comply—regardless of their availability, they do not "review" or interpret the Residents' reports, opting instead to use the Batch Signing method described below.

103. For purposes of the above rules, a "Fellow" is "synonymous" with a "Resident." 42 C.F.R. § 415.152(2).

### 4. Government Payment for Graduate Medical Education Provided by Teaching Hospitals to New Physicians-in-Training as Fellows and Residents

104. Although its coverage of the cost of healthcare services and supplies rendered by hospitals and physicians through Medicare and Medicaid is the Government's most visible, well-known role in maintaining and expanding Americans' access to healthcare, Government funding also plays an increasingly critical role in an equally important factor impacting the availability of affordable, quality healthcare: the education and supply of physicians available to provide treatment.

105.    How services performed by Radiology Resident students are billed and paid by

Medicare, if at all, depends on the context in which the services are rendered. Generally, a

Resident Radiologist may provide services in three (3) different settings:

     a.   Within the scope of their ACGME residency training program;

     b.   Outside the scope of the residency program but still within the facilities of the

         sponsoring institution ("internal moonlighting"); or

     c.   Outside the scope of the residency program and outside the facilities of the

         sponsoring institution ("external moonlighting").

106.     Under the first scenario, services rendered as part of residency training, a

Radiology Resident student's services are "specifically excluded from being paid as 'physician

services', defined in § 414.2 of this chapter, and are payable as hospital services." 42 C.F.R.

§ 415.200(a). Rather, the "payment methodology for services of Residents in hospitals and

hospital-based providers is set forth in §§ 413.75 through 413.83," which governs the cost-based

formula used by Medicare to calculate direct GME payments, 42 C.F.R. § 415.200(a), while

indirect GME payments are calculated according to 42 C.F.R. § 105(a).

### a.   Residency Program Funding and Regulatory Framework

107.    While originally intended to subsidize physician training "until the community

undertakes to bear such education costs in some other way," H.R. Rep. No. 213, pt.1, at 36

(1965), Congress amended the Social Security Act in 1983 to provide a more specific,

individualized, cost-based formula for Graduate Medical Education ("GME") funding in

response to the increasing costs of healthcare and the corresponding rise in the demand for

skilled physicians. S. Rep. No. 98-23, at 52-53.

108.    This formula, which is based generally on a teaching hospital's ratio of Residents to patients and Medicare beneficiaries and described in further detail below, has been repeatedly adjusted and scrutinized as lawmakers, regulators, and other stakeholders balance the expense of Residents' on-the-job training and the increasing cost of healthcare with quality of care and patient safety.

109.    Indeed, a 2016 report by the Congressional Research Service found that, in addition to administering 72 federal programs designed to increase the healthcare workforce, HHS, through CMS, paid an estimated $15 Billion, generally to teaching hospitals, for medical residency training programs (referred to collectively as "Graduate Medical Education" or "GME"). Congressional Research Service 2016 report, Heisler *et al.*, *Federal Support for Graduate Medical Education: An Overview*, 1-2, (Feb 12, 2016), available at https://fas.org/sgp/crs/misc/R44376.pdf.

110.    The Government recognizes that the stress placed on Residents poses a risk to the wellbeing of patients as well as to the Residents.  Consequently, regulators not only tightly monitor Resident training hours, but also require programs to monitor Resident fatigue and provide specified levels of faculty-staff supervision, recognizing that medical error is the third leading cause of death in the U.S. after heart disease and cancer, accounting for more than 250,000 deaths each year, according to researchers at Johns Hopkins University. *Liv Osby*, *Safety Questions Raised as Hours Set to Increase for Medical Residents*, THE STATE (May 9, 2017), http://www.thestate.com/news/state/south-carolina/article149512269.html.

111.    In the United States, medical school graduates are required to complete at least three years of residency training in their specialty and may complete up to eight years of training by continuing into a subspecialty "Fellowship."

112.    Such training takes place at teaching hospitals, also called "sponsoring institutions," where Attending/Teaching Physicians serve as both hospital staff and medical school faculty.

113.    Defendant University of Iowa Health Care's University of Iowa Hospital is a teaching hospital.

114.    Defendants' Diagnostic Radiology Residency Program presently receives millions of dollars annually from the federal government's Medicare program, as a part of a Medicare Part A payment is adjusted upward according to the GME payment formulas described below.

115.    Generally, residency programs are extremely competitive and designed to provide a variety of hands-on, clinical training to Residents according to specialty-specific standards set by the Accreditation Council for Graduate Medical Education ("ACGME"), an independent, non-profit organization to which CMS delegates regulation of the approximately 10,700 unique, Government-funded residency and fellowship programs in 154 specialties and subspecialties at 800 sponsoring institutions. ACGME *About Us*, http://www.acgme.org/About-Us/Overview, [accessed Nov. 20, 2017].

116.    The ACGME's Residency "Core Requirements", described in further detail below, universally:

> (1) require that residency programs provide the "essential learning activity" of a residency, meaning "interaction with patients under the guidance and supervision of faculty members who give value, context, and meaning to those interactions" with Residents taking on "graded and progressive responsibility" for patient care throughout their residency;

    (2) prohibit residency programs from exploiting Government-funded residency labor by tightly restricting Residents to a maximum of eighty (80) working hours per week; and

    (3) require residency programs to designate an "appropriately credentialed and privileged attending physician…who is responsible and accountable for the patient's care" and to "demonstrate that the appropriate level of supervision in place for all Residents is based on each Resident's level of training and ability."

ACGME, Program Requirements for Graduate Medical Education in Diagnostic Radiology, 2017, §§ VI.A.2(a)(1) and (b)(1).

117. The ACGME further requires certified programs to "monitor the need for and ensure the provision of back-up support systems when patient care responsibilities are unusually difficult" and to comply with their own written policies and procedures. *Id.* §§ II.A.4.k) and l).

### b. Payment for Residency Training Services

118. A teaching hospital that obtains and maintains ACGME accreditation by meeting the standards outlined above is eligible to receive both direct and indirect Graduate Medical Education ("GME") funding from CMS. 42 C.F.R. § 415.200(a); 42 C.F.R. § 105(a).

119. Direct GME ("DGME") payments are based on several factors, including the number of the sponsoring hospital's full-time equivalent ("FTE") Residents and cost-reports submitted by the hospitals for all costs directly incurred by the residency program, including Resident stipends, Attending/Teaching Physicians' salaries, and administrative costs.

120.    The total amount paid by Medicare is then a product of the "total approved DGME costs" and the hospital's "Medicare patient load percentage" and paid as a lump sum payment specific to the program. Heisler *et al., Federal Support for GME*, at 8.

121.    The total approved DGME costs are based on the hospital's weighted FTE count, subject to a cap, and a prospectively determined per-Resident amount. Individual Residents are weighted between 0.5 and 1.0 for the FTE count, depending on how far along in their residency they are, and the hospital's approved FTE count is a rolling average of the count over the past three years. Heisler *et al., Federal Support for GME*, at 8.

122.    The Medicare patient load percentage is a function of the hospital's total days of Medicare Part A-covered stays out of total inpatient days plus 86% of Medicare Part C inpatient days out of the total. Heisler *et al., Federal Support for GME*, at 9.

123.    Medicare only provides GME payments for "residency programs approved by the Accreditation Council for Graduate Medical Education [ACGME], by the American Osteopathic Association, by the Commission on Dental Accreditation of the American Dental Association, or by the Council on Podiatric Medical Education of the American Podiatric Medical Association." 42 C.F.R. § 415.5.

124.    In order to count an individual Resident towards its FTE count for use in GME payment calculation, the federal regulation requires that a hospital furnish documentation regarding the Resident's identity, medical school graduation, the "name of the employer paying their salary," the type of residency program they are in, the dates they are "assigned to the hospital and any hospital-based providers," and the dates they are "assigned to other hospitals, or other freestanding providers, and any non-provider setting during the cost reporting period, if any." 42 C.F.R. § 413.75(d).

125.     Thus, Medicare generally pays for services rendered by a Resident acting *within* their residency training program indirectly as part of its overall Medicare Part A GME-adjusted payment to the hospital, but such payment is not made on a per-procedure basis.

126.     In addition to DGME funding, payment for Residents' services is made as part of a hospital's Medicare Part A payment insofar as GME funding is determined on a "reasonable cost basis," albeit one that reflects the higher costs associated with being a teaching hospital. 42 C.F.R. § 413.1(a)(1)(k); *c.f.* CMS, *Medicare Benefit Policy Manual*, Pub. No. 100-02, ch. 1, § 60.

127.     Accordingly, the DGME formula outlined above is listed in Subpart F of 42 C.F.R. Part 413's "Principles of Reasonable Cost Reimbursement" for Medicare Part A, among other "Specific Categories of Costs." Finally, in addition to receiving *direct* payments based on the above per-Resident formula, teaching hospitals receive "indirect graduate medical education" (IGME) funding to reflect the higher patient care costs of teaching hospitals relative to non-teaching hospitals within Medicare Part A's PPS for Inpatient Operating Costs. 42 C.F.R. § 105. CMS determines IGME costs by first calculating the hospital's ratio of FTE Residents to the number of beds and the hospital's Diagnostic Related Group ("DRG") revenue for inpatient operating costs. 42 C.F.R. § 105(a).

128.     The FTE Residents-to-bed ratio is then used to determine the hospital's "education adjustment factor" using the formula $c \times [(1 + r).405 - 1]$, where "c" is a multiplier set by Congress, currently 1.35, which is then multiplied by the hospital's total DRG revenue to determine the amount of the additional IGME payment. 42 C.F.R. § 105(c)-(e).

129.     All Medicare-eligible hospitals, including Defendant UIHC, "must meet the recordkeeping and cost reporting requirements of §§ 413.20 and 413.24," which respectively

require detailed, comprehensive annual "cost reports" and the use of reliable, approved

accounting methods. 42 C.F.R. § 412.52.

130.     Failure to submit accurate cost reports can result in CMS withholding Medicare

payment, whole or in part, as well as termination of the hospital's provider agreement. 42 C.F.R.

§ 412.40.

131.     When submitting cost reports to the Government in exchange for Medicare Part A

funding, providers like Defendant UIHC make the following certification:

> I further certify that I am familiar with the laws and regulations regarding
>
> the provision of health care services, and *that the services identified in this*
>
> *cost report were provided in compliance with such laws and regulations*.

42 C.F.R. § 413.24(b)

132.     At all times relevant to this complaint, Defendant UIHC was familiar with the

laws and regulations governing the supervision, review, and approval of diagnostic radiology

services rendered by Resident Radiologists. Thus, on multiple occasions since at least 2012,

Defendant UIHC has falsely provided the above certification in exchange for its receipt of

Medicare Part A funding for its Radiology Residents.

## VII.     <u>FACTUAL BACKGROUND</u>

### A.  <u>Relator Richard Rezko</u>

133.     Plaintiff Relator Richard Rezko received his medical degree in May 2012 upon

his graduation from the University of Illinois-Chicago's College of Medicine after receiving a

Bachelor of Science Degree in Biology in 2006 from Loyola University in Chicago, Illinois.

134.     After completing a transitional one-year student residency at Indiana University

Methodist Hospital in Indianapolis, Indiana in 2011, Relator became a second-year Resident in

the University of Wisconsin Hospital & Clinics Diagnostic Radiology Residency Program in Madison, Wisconsin, completing his Diagnostic Radiology Residency there in September 2017.

135.    As part of his residency training, Relator Rezko rotated through several sections of the UW Hospital Radiology Residency program and correspondingly gained experience in a variety of radiology modalities under the supervision of faculty staff Attending/Teaching Physicians, including diagnostic pediatric radiology, neuroradiology, body imaging, musculoskeletal imaging, and nuclear medicine.

136.    During his residency, Relator participated in didactic Resident training conferences, attended faculty lectures on a range of radiology topics, and presented quarterly lectures to UW Medical School students as part of the medical school's radiology curriculum.

137.    Upon completion of his residency with UW Hospital, Relator Rezko became a Radiology Fellow with the Defendant UIHC's Radiology Department beginning in July 2018.

**B.  UIHC's Financial Situation Incentivizing Fraud**

138.    In 2007 and 2008, Defendant University of Iowa Health System, d/b/a University of Iowa Health Care's flagship healthcare provider, the University of Iowa Hospitals and Clinics (hereinafter "UIHC" or "Defendant UIHC") was struggling financially, due to key practice areas and patient populations shrinking in the wake of the recession.

139.    In November 2008, Moody's downgraded the bond rating for UIHC from "stable" to "negative."

140.    As described in further detail below, one long-time UIHC physician faculty member who lived through UIHC's financial crisis from 2007, describes UIHC's financial situation from 2007 and for the few years following, as "desperate."

141.    Over the next decade, Defendant UIHC rebounded financially by raising money through revenue bonds, investing in additional facilities such as the $292 million Children's Hospital that opened in 2017, and implementing aggressive billing practices including the submission of false claims to the Government to generate additional revenue.

142.    At least by 2012, Defendant UIHC's radiologists, including Defendant Drs. D. Lee Bennett, UIHC's Vice Chair of Radiology Operations, and Kenjirou Ohashi, Director of UIHC's Musculoskeletal Radiology Fellowship Program (collectively, Defendant UIHC except where otherwise explained), began submitting false claims for payment to the Government by double billing radiologist patients' "bilateral" image "studies" for Government beneficiaries, but not for other patients; overbilling for diagnostic MRI services it does not provide; and billing for diagnostic 3-D Reconstructions which it does not actually use or need.

### C.  **Defendant UIHC's Organizational Structure**

143.    Incorporated in 1994, the University of Iowa Health System is a nonprofit corporation organized and operated to support the clinical, academic, and research programs of the Carver College of Medicine, University of Iowa Physicians, and University of Iowa Hospitals and Clinics. The University of Iowa Health System does business as "University of Iowa Health Care" and provides healthcare through its hospitals and clinics under the name University of Iowa Hospitals and Clinic ("UIHC").

144.    Founded in 1873, Defendant UIHC is governed by a Board of Directors, and its Chief Executive Officer, Suresh Gunasekaran, is not a physician.

145.    Most UIHC Attending/Teaching Physicians, including those in its Department of Radiology, are also Carver College of Medicine faculty.  Although Carver College and Defendant UIHC are formally and closely "affiliated," UIHC is part of the legally distinct

University of Iowa Health System, and its various fellowship and residency programs are administered exclusively by UIHC employees.

146.    Colin P. Derdeyn is the Chair and Executive Officer of UIHC's Department of Radiology.  He is ultimately responsible to the Chief Executive Officer and the Board of Directors for the Department's clinical and financial performance.

147.    Defendant D. Lee Bennett is the Vice Chairperson of Clinical Affairs and Radiology Operations for the Department of Radiology and as such is a primary liaison between the Directors of UIHC's various Radiology fellowships and residency programs and Chairperson Derdeyn. Defendant Dr. Bennett also practices and teaches as a staff Radiologist and professor in UIHC's Department of Radiology's Division of Musculoskeletal Radiology.

148.    Defendant UIHC's Musculoskeletal Radiology Fellowship Program Director is Defendant Dr. Kenjirou Ohashi, who administers the Musculoskeletal Radiology Residency and Fellowship Programs with Education Program Coordinator Courtney Bork.

149.    Defendants Bennett and Ohashi also regularly serve as Attending/Teaching Physicians and knowingly cause the submission of false claims, as described in detail below.

150.    Defendant UIHC's Radiology Residency Program Director is Defendant Dr. Bruno Policeni.

**D.  Defendant UIHC's Radiology Department's Operational Structure**

151.    UIHC's Radiology Department is operationally organized according to certain radiology subspecialties. Specifically, UIHC's Department is organized into nine Divisions: Body Imaging, Breast Imaging, Cardiovascular and Thoracic Imaging, Interventional Neuroradiology, Musculoskeletal Radiology, Neuroradiology, Nuclear Medicine and Positron

Emission Tomography ("PET"), Pediatric Radiology, and Vascular and Interventional
Radiology.

152.     In addition to its 4-year Diagnostic Radiology Residency program, which
annually includes over 30 Residents who start their 4-year Residency Program immediately
following medical school graduation and who rotate through each of the nine Divisions listed in
the preceding paragraph, UIHC's Radiology Department offers one-year Fellowships for focused
sub-specialty training following a general radiology residency.

153.     Relator, Chelsea Jerenko, Casey Schaffer, and Mikhail Sebaaly are the 2018-2019
academic year UIHC's Musculoskeletal Radiology Fellows in the one-year non-accredited
Fellowship intended to "expose [fellows] to a broad range of clinical problems."

154.     In addition to the fellows' own original interpretations, UIHC's Musculoskeletal
Radiology Fellows are also expected to aid in the review of interpretations originally rendered by
second, third, and fourth-year Residents who are in their Musculoskeletal Radiology rotation.

155.     The process by which Attending/Teaching Physicians review image
interpretations by Fellows and/or Residents prior to the image interpretations becoming part of a
patient's medical record and, in the case of Government Beneficiaries, subsequently billed to
Government healthcare plans, is known as "staffing out."

156.     As described in further detail below there is no actual "staffing out."

157.     Rather, Defendants bill Government healthcare plans for un-reviewed image
interpretations performed by unsupervised Radiology Residents and Fellows pursuant to falsified
billing documentation indicating that it was the Defendant Attending/Teaching Physicians who
performed the interpretations.

## VIII.   DEFENDANTS' FALSE CLAIMS CONDUCT

### A.  Defendants' Schemes for Presenting False Claims

158.    As introduced above, Defendants are engaged in schemes to submit false claims to the Government involving the over-billing of Medicare, Medicaid, and other federally funded healthcare programs for diagnostic radiology services, through the systematic manipulation and falsification of CPT codes and medical records, respectively.

159.    The **X-Ray Comparison Scheme** involves the interpretation and billing of radiograph images of knees and hips that are not medically indicated by the ordering physician or actually used by the billing radiologist to render a diagnosis.

160.    The **Long Leg View Scheme** involves the billing for diagnostic radiograph imaging and interpretation of the tibia and fibia that is not actually performed.

161.    The **Myeloma MRI Scheme** involves billing for MRI images and interpretations never actually provided.

162.    The **Useless 3-D Reconstruction Scheme** involves billing for medically unnecessary interpretations of 3-D Reconstructions of CT images which are not actually used to render any diagnosis and in many occasions are interpreted and billed after the procedure for which the images were ordered has already occurred.

163.    The **Batch Signing Supervision Scheme** involves billing for radiology services rendered by unsupervised Fellows and Residents followed by batch signing in lieu of any actual review and approval.

164.    The **Unsupervised Spinal Tap Scheme** involves billing for lumbar puncture procedures performed by ACGME-accredited Neuroradiology Fellows despite no Attending/Teaching Physician being present for any portion of the procedure.

165.    The **Falsification Scheme** is the systematic falsification of medical records and

billing records in support of the false claims under each of the first five schemes.

166.    **The Payment Retention scheme** is the systematic retention of the payments

received from Government healthcare programs as a result of the above schemes.


B.  **Defendant UIHC's  X-Ray Overbilling Scheme**

167.    Defendant UIHC's Radiology Department systematically causes the submission

of false claims for radiograph (X-ray) imaging of knees and hips that are not medically indicated

by the ordering physician or used to render any diagnosis in order to falsely obtain nearly double

the amount of payment from Government healthcare programs for both the professional and

technical components.

168.    A single X-ray examination typically includes several X-rays taken from different

angles in order to allow the radiologist to complete a full diagnostic "study" or interpretation

reflected in a written report.

169.    Accordingly, the CPT codes for most radiology interpretations, the "professional

component" of the overall diagnostic service, corresponds to the number of views taken.

170.    For example, common Radiograph CPT codes relevant to musculoskeletal

radiology are divided into "Head and Neck" CPT 70010 – 70559; "Chest" CPT 71045 – 71555;

"Spine and Pelvis" CPT 72020 – 72295; "Upper Extremities CPT 73000 – 73225; and "Lower

Extremities" CPT 73501 – 73725.  AMA, *CPT 2018 Professional Codebook*, xvi, (Kenneth P.

Brin, MD *et al*. eds., 4th ed. 1977, rev. 2017).

171.    Within these anatomical categories, the specific CPT code and corresponding

Medicare payment rate under the Physician Fee Schedule in Iowa depends on the number of

views. The more medically necessary images the radiologist needs to analyze to complete the interpretation, the higher the fee.

172. Knee and hip X-rays are typically ordered by orthopedic surgeons, who indicate, via a diagnosis code, which knee is the "affected knee" and the purpose of the order, i.e., the patient's "chief complaint."

173. Diagnosis codes are published by CMS in the International Classification of Diseases, 10th Revision, Clinical Modification, or (ICD-10-CM) and, like, CPT codes, are incorporated expressly by regulation as conditions of payment. 42 C.F.R. § 162.100.

174. An X-ray interpretation claim under CPT 73562, requiring three or more views of a knee, is reimbursed by Medicare at $34.58 per claim.

175. When an orthopedic surgeon orders a knee or X-ray, they enter the diagnosis code for "preoperative evaluation" into patients' medical records— ICD-10-CM: Z01.818.

176. This diagnosis code cannot support a claim for payment for comparison views of the unaffected knee or hip. Like all Medicare-reimbursable procedures, comparison views must be medically indicated, via a diagnosis code, in order to be eligible for reimbursement.

177. Thus, in order to be billable, comparison views must correspond with diagnosis code ICD-10 -CM Z00.6 ("Encounter for examination for normal comparison and control in clinical research program.")

178. Defendant UIHC ignores these simple requirements in order to increase its revenue generated by Government Beneficiaries undergoing knee and hip X-rays.

179. Specific example of Defendant UIHC's scheme to submit false claims for comparison X-Ray views include the following

    a. Medicare Beneficiary G.J.D.

    i.   On or about May 21, 2019, G.J.D. saw Defendant UIHC orthopedic surgeon Dr. Nicolas Noiseaux complaining of right knee pain, and Dr. Noiseaux ordered an X-ray of the right knee, noting "right knee pain" as the medical "indication" and a corresponding "preoperative evaluation" diagnosis code ICD-10-CM: Z01.818.

    ii.   On May 23, 2019, Defendant UIHC's X-Ray Technicians generated 4 views of G.J.D.'s right knee (the affected knee) and 3 images of his left leg (the unaffected knee), with the latter to be potentially used by Dr. Noiseaux for "comparison" purposes.

    iii.   On the same day, Defendant Attending/Teaching Physician D. Lee Bennett submitted claims not only for the medically indicated and used left knee X-ray, but also for the 3 "comparison views" of the left knee, using CPT Code 73562 (knee, 3 views) despite the fact that such views were neither indicated by Dr. Brown nor used by Dr. Bennett to render a diagnosis.

  b.  Medicare Beneficiary G.P.D.

    i.   On or about May 23, 2019, about May 21, 2019, G.P.D. saw Defendant UIHC orthopedic surgeon Dr. Nicolas Noiseaux complaining of right knee pain, and Dr. Noiseaux ordered an X-ray of the right knee, noting "right knee pain" as the medical "indication" and a corresponding "preoperative evaluation" diagnosis code ICD-10-CM: Z01.818.

ii. On May 23, 2019, Defendant UIHC's X-Ray Technicians generated 4 views of G.P.D.'s right knee (the affected knee) and 3 images of his left leg (the unaffected knee), with the latter to be potentially used by Dr. Noiseaux for "comparison" purposes.

iii. On the same day, Defendant Attending/Teaching Physician D. Lee Bennett submitted claims not only for the medically indicated and used left knee X-ray, but also for the 3 "comparison views" of the left knee, using CPT Code 73562 (knee, 3 views) despite the fact that such views were neither indicated by Dr. Brown nor used by Dr. Bennett to render a diagnosis.

c. Medicare Beneficiary G.R.

i. On April 17, 2019, Beneficiary G.R. met with Defendant UIHC orthopedic surgeon Dr. Timothy S. Brown complaining of left knee pain, and Dr. Brown ordered an X-ray of the left knee, noting "left knee pain as the medical "indication and a corresponding "preoperative evaluation" diagnosis code ICD-10-CM: Z01.818.

ii. On the same day, Defendant UIHC's X-Ray Technicians generated 4 views of G.R.'s left knee (the affected knee) **and** 3 views of his right leg (the unaffected knee), with the latter to be potentially used by Dr. Noiseaux for "comparison" purposes.

iii. On the same day, Defendant Attending/Teaching Physician D. Lee Bennett submitted claims not only for the medically indicated and used right knee X-ray, but also for the 3 "comparison views" of the

44

right knee, using CPT Code 73562 (knee, 3 views) despite the fact

that such views were neither indicated by Dr. Brown nor used by Dr.

Bennett to render a diagnosis.

180.    After noticing the comparison views in his patients' medical and billing records

despite a lack of any supporting diagnosis code, Relator asked a group of Defendant UIHC's X-

Ray Technicians how they knew to perform the X-rays of the unindicated, unaffected knees and

hips. In response, the Technicians indicated that the generation of "comparison views" is an

unwritten, but widely understood, standing order by Defendant UIHC's orthopedic surgeons.

181.    The Technicians, however, were surprised to hear that Defendant UIHC's

Department of Radiology was *billing* for the comparison views as if they were medically

indicated views used for diagnosis.

182.    Billing for X-ray images and interpretations that are neither medically indicated

nor ordered or relied upon by a physician is quintessential healthcare fraud. For example, in 2016

a radiology practice in New York agreed to pay over $10 million in criminal and civil penalties

after pleading guilty to charges based on qui tam whistleblowers allegations that the radiologists

were "performing and billing for procedures that had not been ordered by treating physicians."

See, DOJ Press Release, *Long Island Radiology Company, Zwanger-Pesiri Inc., Pleads Guilty*

*To Federal Health Care Fraud Charges And Agrees To Pay $2.4 Million In Criminal Forfeiture*

(Nov. 16, 2016), https://www.justice.gov/usao-edny/pr/long-island-radiology-company-zwanger-

pesiri-inc-pleads-guilty-federal-health-care.

C. **Defendant UIHC's Long Leg View Scheme**

183.    A human leg is comprised of sixty-two bones, including the thigh bone (femur) and the shin bones (the tibia and fibula).

184.    The imaging and corresponding diagnostic interpretation services for a femur X-ray is billed using **CPT Code 73551** ("femur, 1 view") while an imaging and interpretation of the shin bones is billed using **CPT 73590** ("tibia and fibula, 2 views"). Medicare pays $26.34 and $27.32, respectively, per claim for these codes, for services rendered in an Iowa hospital, like Defendant UIHC.

185.    The tibia and fibula are the only two bones in the calf/lower extremity and are inseparable, both anatomically and for the purposes of imaging/obtaining views. Therefore, when radiologists obtain 1 view of the tibia, it necessarily includes the fibula, and vice versa. Thus, the "2 view" referenced in CPT 73590 refers to two views of both the tibia and fibula, not to one view of each.

186.    Defendant UIHC routinely submits both codes in claims submitted to the Government for payment even though no diagnostic imaging or interpretation of the femur or tibia and fibula is actually performed.

187.    Instead, Defendant UIHC performs only a cursory review of a non-diagnostic, low-dose, x-ray image of the anterior-posterior (AP) view of the leg—commonly referred to as the "long leg view"— used only to check the alignment of the leg and knee as part of standard preoperative evaluation. This image includes only one, non-diagnostic view of the tibia and fibula.

188.    The long leg X-ray images and views are not the same as the femur, tibia and fibula images and views that correspond with CPT Codes 73551 and 74590. While the long leg

view may certainly be helpful for checking the general *alignment* of a patient's leg, it provides no diagnostic value for interpretation of a patient's femur, tibia, or fibula specifically.

189.    In radiology parlance, the long leg view is "non-diagnostic."

190.    Specific examples of long leg views and alignment checks rendered and performed billed by Defendant UIHC's Attending/Staff Physicians and then billed as femur, tibia, fibula views and diagnostic interpretations include the following:

a.  Medicare Beneficiary R.B.

i.    On March 29, 2019, a low-dose, non-diagnostic X-ray image of the anterior-posterior view of Beneficiary R.B.'s leg (long leg view) was rendered by Defendant UIHC Department of Radiology.

ii.    On the same day, Attending/Teaching Physician Howard O'Rourke used the long leg view to perform a pre-operative check of the alignment of R.B.'s leg. No image or interpretation of the femur, tibia, or fibula was performed.

iii.    On the same day, Dr. O'Rourke caused Defendant UIHC to submit a false claim for payment for CPT Code 73551 (one view of the femur) and CPT 73590 (two views,  tibia/fibula)

b.  Medicare Beneficiary F.S.

i.    On April 1, 2019, a low-dose, non-diagnostic X-ray image of the anterior-posterior view of Beneficiary F.S.'s leg (long leg view) was rendered by Defendant UIHC's Department of Radiology.

ii.    On the same day, Attending/Teaching Physician Defendant D. Lee Bennett used the long leg view to perform a pre-operative check of the

alignment of F.S.'s leg. No image or interpretation of the femur, tibia, or fibula was performed.

   iii.  On the same day, Dr. Bennett caused Defendant UIHC to submit a false claim for payment for CPT Code 73551 (one view of the femur) and CPT Code 73590 (two views, tibia/fibula)

c.   Medicare Beneficiary M.C.

   i.  On April 23, 2019, a low-dose, non-diagnostic X-ray image of the anterior-posterior view of Beneficiary M.C.'s leg (long leg view) was rendered by Defendant UIHC's Department of Radiology.

   ii.  On the same day, Attending/Teaching Physician Howard O'Rourke used the long leg view to perform a pre-operative check of the alignment of M.C.'s leg. No image or interpretation of the femur, tibia, or fibula was performed.

   iii.  On the same day, Dr. O'Rourke caused Defendant UIHC to submit a false claim for payment for CPT Code 73551 (one view of the femur) and CPT 73590 (two views, tibia/fibula)

191.   Upon discovering the disparity between the imaging being performed and the imaging being billed, as illustrated above, in the course of performing his own duties, which include the review of long leg X-ray images, Relator on April 11, 2019 spoke with of one UIHC's X-Ray Technicians, Russel Johnson, to make sure he was looking at the correct images.

192.   Specifically, Relator asked Johnson what images the X-Ray Technicians were actually taking as long leg views, noting, "when I go to dictate these, it says there is a femur radiograph and a tib-fib radiograph."

193.    Confused, Johnson confirmed that the Technicians are only rendering a low-dose,

AP view of the patients' legs, saying "for us, it just comes up as a long leg." When Relator

showed Johnson that the same images are billed by Attending/Teaching Physicians as CPT Code

73551 (one view of the femur) and CPT 73590 (one view tibia, one view fibula), Johnson

replied: That sounds illegal…. it sounds like you're charging the patient twice for one exam.

### D.  Defendant UIHC's Myeloma MRI Scheme

194.    Defendant UIHC's Radiology Department systematically causes the submission

of false claims for MRI imaging services ostensibly perfumed as part of a full diagnostic scan for

multiple myeloma, a rare form of cancer. In reality, Defendant UIHC conducts what amounts

only to a cursory assessment of bone marrow, performing and interpreting exactly half of the

MRI "sequences" they claim to provide in billing and medical records.

195.    Multiple *myeloma* (from the Greek *myelo-* meaning "marrow" and *-oma* meaning

"tumor") refers to a rare type of cancer that forms the white blood cells responsible for helping

the body fight infections by making antibodies to attack germs. The cancer causes cells to

accumulate in the bone marrow, where they crowd out healthy blood cells.

196.    Detecting multiple myeloma is difficult, as those with the early stage of the

disease may exhibit no symptoms, while later-stage patients exhibit symptoms like fatigue,

numbness, weight loss, nausea, bone pain, constipation, and excessive thirst.

197.    As a tertiary center employing regionally and nationally known hematologists

such as Dr. Yogesh S. Jethava, Defendant UIHC has a large myeloma patient population despite

the relative rareness of the disease.

198.     Generally, multiple myeloma treatment—both preventative and active— involves regulatory monitoring of the disease state by assessing visual changes in the patients' bone marrow using magnetic resonance imaging (MRI).

199.     MRI scans are a highly versatile imaging technique that utilizes magnetic fields and magnetic gradients to generate images of the body's organs and other internal structures.

200.     An MRI scan is typically comprised of a series of MRI "sequences," short for "pulse sequence," which refers to the timed settings of each magnetic pulse sequences and pulsed field gradients used to generate the required image.

201.     Thus, each sequence is tailored for a specific purpose, such that the sum of these sequences taken allows a radiologist to provide a diagnosis, otherwise known as an "Impression," which is then dictated and placed into a written report.

202.     When Defendant UIHC's Radiology Department submits claims for the MRI assessments of multiple myeloma patients' bone marrow, each **body-length scan** is billed using four (4) MRI CPT codes:

   a.  **CPT 70551** (Brain w/o contrast) (Medicare pays $211.94);

   b.  **CPT 71550** (MRI chest without contrast) (Medicare pays $376.11);

   c.  **CPT 72141** (MRI C spine without contrast) (Medicare pays $206.53);

   d.  **CPT 72195** (MRI pelvis without contrast) (Medicare pays $252.40);

203.     Each code corresponds to a set of "sequences" labeled using anatomical terms of location for the human body, i.e. planes and axes.

204.     An MRI brain Scan (CPT 70551) consists of eight different MRI sequences: Sagittal T1 IR; Axial T2 TSE; Axial GRE; Ax FLAIR; Axial T1 IR; Sagittal T1 IR Blade; Axial Diffuse DWI; and Axial Diffusion ADC.

205.     Each sequence, following a written protocol, is initiated performed by the MRI technician. Each sequence can take anywhere from 30 seconds to a few minutes, with a typical MRI brain scan lasting about 20 minutes.

206.     An MRI cervical spine scan (CPT 72141) consists of six different MRI sequences: Sagittal 3-D T2 Space; Sagittal T2; Sagittal T1; Axial T2; Axial Diffusion; and Coronal T2 Fat Sat myelogram.

207.     An MRI pelvis and chest scan (CPT 72195) each consist of five different MRI sequences: Coronal T1; Coronal STIR; Axial T1; Axial T2 Fat Sat; and Axial Diffusion.

208.     Thus, Defendant UIHC bills for a comprehensive MRI diagnostic exemption of patient-beneficiaries' bone marrow consisting of 24 sequences.

209.     However, the comprehensive examination which Defendant UIHC submits as claims to Medicare, Medicaid, and other federal funded healthcare programs is not the examination that it actually provides.

210.     Instead, Defendant UIHC's bone marrow studies consist of precisely half of the number of sequences for which it bills, as Defendant's MRI scans include only the following:

  a. Axial T1, Axial STIR – of the Calvarium; yet billed using CPT 70551 as though it were an actual MRI brain scan when in fact it is not;

  b. Coronal T1 and STIR of the shoulders AND Coronal T1 and STIR of the sternum; yet billed using CPT 71550 as though it were an actual MRI chest scan when in fact it is not;

  c. Sagittal T1 and STIR of the spine; yet billed as a CPT 72141 as though it were a proper MRI cervical spine scan when in fact it is not;

    d.   Sagittal T1 and STIR of the L spine AND Axial T1 and STIR of the pelvis;

        yet billed as a CPT 72195 as though it were an actual MRI pelvis scan when

        in fact it is not.

211.    As a result of their scheme to provide half the number of MRI sequences it claims to have provided in order to save time and money while maximizing revenue for technical and professional component payments, Defendants have not only bilked the Government of hundreds of thousands, if not millions of dollars, since this scheme commenced in 2012, but also mislead patients facing a deadly disease regarding the progress of the cancer in their bones.

212.    Examples of Defendants' Myeloma MRI Scheme include the following:

    a.   Beneficiary P.K.

        i.   On May 1, 2018 Defendant Dr. D. Lee Bennett caused a claim to be submitted by Defendant UIHC to Medicare for a Multiple Myeloma MRI diagnostic study under CPT Codes 70551, 71550, 72141, and 72195 purportedly provided to Beneficiary P.K.

        ii.   No such study was actually performed.

        iii.   Rather, Dr. Bennett provided Beneficiary P.K. with an interpretation of a collection of non-diagnostic MRI sequences for the given body parts which constitutes a non-billable "screening," at best.

    b.   Beneficiary M.D.

        i.   On May 6, 2018 Defendant Dr. Kenjirou Ohashi caused a claim to be submitted by Defendant UIHC to Medicare for a Multiple Myeloma MRI diagnostic study under CPT Codes 70551, 71550, 72141, and 72195 purportedly provided to Beneficiary M.D.

    ii.     No such study was actually performed.

    iii.    Rather, Dr. Ohashi provided Beneficiary M.D. with an interpretation of a collection of non-diagnostic MRI sequences for the given body parts which constitutes a non-billable "screening," at best.

  c.  Beneficiary D.C.

    i.      On May 13, 2019, Defendant UIHC Attending/Teaching Physician Dr. Howard O'Rourke caused a claim to be submitted by Defendant UIHC to Medicare for a Multiple Myeloma MRI diagnostic study under CPT Codes 70551, 71550, 72141, and 72195 purportedly provided to Beneficiary D.C.

    ii.    No such study was actually performed.

    iii.   Rather, Dr. Ohashi provided Beneficiary D.C. with an interpretation of a collection of non-diagnostic MRI sequences for the given body parts which constitutes a non-billable "screening," at best.

213.    When Relator on or about April 5, 2019 pointed out the omission of half of the MRI sequences occurring in connection with the multiple myeloma bone marrow assessments, Ohashi acknowledged that the exam actually being rendered is a non-billable "screening" exam, not the comprehensive diagnostic procedure for which Defendants submit claims to the Government.

214.    Defendant UIHC implements its multiple myeloma MRI fraud scheme systematically, intentionally omitting the same necessary sequences in every bone marrow assessment pursuant to a written protocol followed by MRI technicians.

215.     From April 13, 2018 to April 13, 2019, Defendant UIHC performed, interpreted, and submitted false claims for payment for no less than 452 MRI scans using the four CPT codes described above. Relator estimates that at least half of the patients receiving these scans were beneficiaries of federally funded healthcare plans.

### E.   Defendant UIHC's Useless 3-D Reconstruction Scheme

216.     Defendant UIHC's Radiology Department systematically causes the submission of false claims for 3-D Reconstructions of images rendered as part of patient-beneficiaries' pre-operative CT scans. However, these 3-D Reconstructions' corresponding professional services are provided after the billing Radiologists have already rendered a diagnosis using 2D CT images, and often even after patient-beneficiaries' procedures are already completed.

217.     Multiplanar reconstruction of radiological studies, also known as 3-D Reconstruction, involves the automated reformatting of two-dimensional images into three dimensional images.

218.     For most diagnostic radiological procedures, e.g. X-rays or "plain film," described above, the review of images in various formats is contemplated within the definition of the CPT code for that particular imaging procedure.

219.     But for selected imaging procedures, the CPT coding system provides for separate coding for image reformatting where such reformatting entails 3-D Reconstruction. See AMA, *CPT 2018 Professional Codebook*, at 466, "Other Procedures," (Kenneth P. Brin, MD *et al*. eds., 4th ed. 1977, rev. 2017).

220.     In 2006, the AMA announced that 3-D Reconstruction imaging and interpretation would be reported using two, new CPT Codes: 76376 and 76377.

221.    CPT Codes for 3-D Reconstruction rendered services differentiate between those studies in which reformatting is performed on the acquiring scanner (CPT 76376) and those performed on an independent work station (CPT 76377).

222.    Both 3-D Reconstruction codes require concurrent supervision of the reformatting process—called "image postprocessing"—which is performed by a technician.

223.    For 3-D Reconstructions not requiring postprocessing on an independent workstation, (CPT 73676), the ordering physician will discuss with the technologist the need for 3-D imaging and supervise the technologist.

224.    As described above, in order for Medicare or other federally-funded healthcare programs to pay for 3-D Reconstructions, they must be medically necessary.

225.    Medicare and Medicare-funded insurance carriers, through Local Coverage Determinations (LCDs) have placed clear restrictions on when Medicare will consider 3-D Reconstructions to be medically necessary.

226.    For example, Medicare contractors Molina Healthcare, citing Medicare LCD #'s L33256, L35408, and L33416, allowed Medicare payment for 3-D Reconstruction "only under the following circumstances:

> (1) When the information to be obtained from the test cannot be provided by another procedure (magnetic resonance imaging, ultrasound, angiography, etc.), or
>
> (2) When the information could not be provided by a standard CT scan (two dimensional) without reconstruction, **and** the test is needed as part of pre-operative planning in certain clinical circumstances, such as skull

abnormalities, complex craniofacial reconstructive surgery, and complex spine fractures.

*See* Molina Healthcare, 3-D Interpretation and Reporting of Imaging Studies, Policy Number MCR-124, Rev. Aug. 8, 2016, n. 1, https://www.molinahealthcare.com/providers/wa/medicaid/resource/PDF/3-D-Interpretation-and-Reporting-of-Imaging-Studies-MCG-124.pdf.

227. Likewise, Palmetto GBA, citing Medicare LCD # L28229, notes in its billing policies that "Medicare expects that the referring physician generate a written request indicating the clinical need for the add on 3-D imaging; that a copy of that request be maintained by the interpreting physician; and that the interpreting physician's report address those specific clinical issues."

228. Thus, generally, 3-D Reconstruction is not covered by Medicare if equivalent information obtained from the test has already been provided by another procedure (magnetic resonance imaging, ultrasound, angiography, etc.) or could be provided by a standard CT scan (two-dimensional) without reconstruction.

229. Nonetheless, that is exactly what Defendant UIHC does—routinely ordering, performing, interpreting, and billing for "preoperative" 3-D Reconstructions routinely after a diagnosis has already been reached using a 2-D CT image, and, oftentimes, even after the beneficiary's procedure has already been completed.

230. Underscoring the materiality of the actual diagnostic use of, and medical indication for, 3-D Reconstruction services is the $15.5 million settlement announced in February 2014 by the United States on resolution of allegations that a New York diagnostic radiology practice had billed for "3-D Reconstruction of CT Scans" that were either "medically

unnecessary" or "never performed or interpreted." *See Department of Justice, U.S. Attorney's Office Press Release*, dated February 25, 2014, https://www.justice.gov/opa/pr/diagnostic-imaging-group-pay-155-million-allegedly-submitting-false-claims-federal-and-state.

231.    Most of the 3-D Reconstructions billed by Defendant UIHC are offered by orthopedic and cardiovascular surgeons, rendered in an independent work station by a technician named Mark Nicklaus using a software program called Vitrea, and then interpreted and billed using CPT 76377 by Defendant UIHC's Radiology Department Attending/Teaching Physicians, including Defendants Drs. Bennett and Ohashi.

232.    Representative examples of Defendants' scheme to submit false claims for medically unnecessary 3-D Reconstructions include the following:

    a.   Beneficiary B.J.

        i.   On October 18, 2017, Beneficiary B.J. received a CT of her cervical spine that was interpreted and billed by a Defendant UIHC Attending/Teaching Physician.

        ii.   Fifteen months later, on January 18, 2019, Defendant UIHC technicians performed a 3-D Reconstruction of the same CT scan, which was then interpreted and billed by Attending/Teaching Physician Joan Maley.

        iii.   Dr. Maley did not use the 3-D Reconstruction to render any diagnosis.

        iv.   Dr. Maley then "combined" the record of her 3-D interpretation so that it would falsely appear to have been performed around the same

time as the 2-D scan on which the entire diagnosis was exclusively based.

b. Beneficiary E.L.

    i.    On February 13, 2019, Beneficiary E.L. received a 2D CT scan of the right shoulder due to pain and instability. The CT was interpreted and a diagnostic report was completed and billed by Defendant UIHC Attending/Teaching Physician Howard O'Rourke the same day.

    ii.    On February 15, 2019 Defendant UIHC technicians performed a 3-D Reconstruction of the same CT scan, which was then "interpreted" and billed by Dr. O'Rourke.

    iii.    Dr. O'Rourke did not use the 3-D Reconstruction to render any diagnosis.

    iv.    Dr. O'Rourke then "combined" the record of his 3-D interpretation so that it would falsely appear to have been performed at the same time as the original 2-D Scan on which the entire diagnosis was exclusively based.

c. Beneficiary L.V.

    i.    On February 28, 2019, Beneficiary L.V. received a 2D CT scan of the right shoulder due to pain and instability. The CT was interpreted and a diagnostic report was completed and billed by Defendant UIHC Attending/Teaching Physician Howard O'Rourke the same day.

ii. On March 1, 2019 Defendant UIHC technicians performed a 3-D Reconstruction of the same CT scan, which was then "interpreted" and billed by Dr. O'Rourke.

iii. Dr. O'Rourke did not use the 3-D Reconstruction to render any diagnosis.

iv. Dr. O'Rourke then "combined" the record of his 3-D interpretation so that it would falsely appear to have been performed at the same time as the 2-D Scan on which the entire diagnosis was exclusively based.

d. Beneficiary K.S.

i. On April 7, 2019, Beneficiary K.S. received a CT of the left elbow that was interpreted and billed by Defendant Dr. D. Lee Bennett before having surgery on or about April 10.

ii. Over a month later, on May 16, 2019, Defendant UIHC technicians performed a 3-D Reconstruction of the same CT scan, which was then interpreted and billed by Defendant Dr. D. Lee Bennett.

iii. Dr. D. Lee Bennet did not use the 3-D Reconstruction to render any diagnosis.

iv. Dr. D. Lee Bennet then "combined" the record of his 3-D interpretation so that it would falsely appear to have been performed around the same time as the 2-D scan on which the entire diagnosis was exclusively based.

e. Beneficiary J.A.

i.    On February June 10, 2019 Beneficiary J.A. received a 2D CT scan
      of the abdomen and pelvis after falling off a horse. The CT was
      interpreted and a diagnostic report was completed and billed by
      Defendant UIHC Attending/Teaching Physician Nobuhiro Fujita the
      same day.

ii.   On June 11, 2019 Defendant UIHC orthopedic surgeon Scott
      Elizabeth scheduled J.A. for surgery after Dr. Fujita diagnosed right
      acetabular fractures based on the 2-D CT images. Technicians
      performed a 3-D Reconstruction of the same CT scan.

iii.  On June 12, 2019, J.A. underwent open reduction internal fixation
      (ORIF) surgery to repair the fractures.

iv.   On June 19, 2019, Dr. Fujita purported to interpret the 3-D images,
      billed for the interpretation, and "merged" his report with the June
      11 2-D report so that it would falsely appear to have been performed
      at the same time as the original 2-D Scan on which the entire
      diagnosis was exclusively based.

v.    Dr. Fujita did not use the 3-D Reconstruction to render any
      diagnosis.

233.    In both of the above examples, the patients' charts falsely cite "preoperative
planning" as the reason for the 3-D Reconstruction. This is the false indication cited in the
medical record in support of thousands of false claims for medically unnecessary 3-D
Reconstructions submitted by the Defendants over the past decade.

234.     In 2019, Medicare paid $67.30 for 3-D Reconstruction services rendered in Iowa hospitals.

235.     Defendants generally use terms including, but not necessarily limited to: "combine," "merge," and "correlate" to explain their backdating of 3-D Reconstruction services in patients' medical records. This falsification and concealment occurs different ways depending on the physician (e.g., some "amend" the original 2-D Encounter record, some place a "note" in the 3-D Encounter record purporting to related back to the 2-D record Encounter record, and others generate an entirely new, third "combined" encounter).

236.     When Relator on or about April 2, 2019, spoke with Defendant Dr. Ohashi regarding his concerns about the timing and medical necessity of 3-D Reconstructions, Dr. Ohashi brazenly admitted that upon interpreting the 3-D Reconstructions, Defendant UIHC Radiologists must "combine" the 3-D interpretation with the older medical record of the original 2-D interpretation. When Relator pointed out that this was contrary to the reality of 3-D reconstructions rendered days or weeks after the image, Defendant Ohashi acknowledged "right, that's a problem," laughing.

237.     Similarly, on April 22, 2019, when Relator spoke with one of Defendant UIHC's 3-D Reconstruction Technicians about the discrepant timing of the 3-D Reconstruction vis-a-vis his original diagnosis based only on 2-D images, the Technician described the occurrence as "typical," explaining that sometimes the surgeon will "think they need them" before a surgery but that they will nonetheless be completed days later, regardless of the completion of an intervening 2-D diagnosis, depending on the availability of the technicians and the timing of the surgery. Defendant UIHC then causes the date of the medically unnecessary interpretation to "sync together" in the patient's chart, the Technician explained.

238.     On May 16, 2019, when Relator pointed out the above examples to Defendant Dr.

Bennett, Dr. Bennett blamed "the technology" before admitting that he did not personally "like

billing the patient if it's after the fact, cause it's not helping the patient."

239.     On May 20, 2019, Relator spoke about the discrepant timing of the 3-D

Reconstructions vis-a-vis the original order and completed diagnoses with Defendant UIHC's

Lead Technician for 3-D Reconstructions, Mark Nicklaus. When Relator asked Mark why

Defendant UHIC was billing on May 20, 2019 for an interpretation of a 3-D Reconstruction that

was ordered on April 7, 2019 as part of the preoperative planning of a surgery performed April

10 for Beneficiary K.S., Mr. Nicklaus replied "I don't know why they didn't show up 'til now,

that's weird" before noting that one of the other 3-D Technicians, Angela, "oftentimes forgets to

assign them to a reading room."

240.     In the same conversation, Mr. Nicklaus admitted that the interpretation of the 3-D

Reconstructions were medically unnecessary, stating to Relator, "basically all you need to do is

basket dictation…your diagnosis from the 3-D isn't going to change from what it was from the

2-D."

241.     Finally, Relator on May 24, 2019 discussed the medical purpose of the 3-D

Reconstructions expressly with Mr. Nicklaus and one other Technician. When Relator explained

his concerns about interpreting and billing (or causing the billing) for 3-D Reconstructions

rendered after a diagnosis and/or procedure had already been completed, Mr. Nicklaus

responded, "it's free money, just do it…just hold your hand out behind your back" while the

other Technician remarked, "he's got a conscience," referring to Relator.

242.     Relators' fellow MSK Fellows have likewise confirmed commonly seeing 3-D

Reconstructions "pop up" in their queue of interpretations days and even weeks after already completing a 2D interpretation of the same scan for the same patient.

### F. Defendant UIHC's Batch Signing Supervision Scheme

243. Defendant UIHC's entire Radiology Department systematically submits claims for payment for Teaching Physician services that are not actually provided. By routinely batch-signing preliminary reports, Defendant UIHC's Attending/Teaching Physician Radiologists falsely represent to the Government, via the addition of the GC modifier, that they have independently reviewed and interpreted diagnostic reports in compliance with 42 C.F.R. § 418.180.

244. Additionally, UIHC requires three of their four Musculoskeletal Radiology Fellows, including Relator, who are ostensibly at UIHC to receive additional "hands on" subspecialty training, to serve as "Billing Fellows" and be the sole reviewers of high-volume radiograph interpretations performed by Residents during 15 to 24-hour, overnight, on-call shifts when Residents' error rates are at their highest. *See* Alexander Ruutianien, MD, et al., *Increased Errors Rates in Preliminary Reports Issued by Radiology Residents Working More Than 10 Consecutive Hours Overnight*, 20 Academic Radiology 305, 305 (2013).

245. During his first week on-site at UIHC in early July 2018 in a meeting arranged by UIHC Human Resources Director Amy Stewart, Relator and the other three Radiology Fellows met with two representatives from Epic Systems, Brian Balkenende and Monica Belt, in the UIHC Musculoskeletal Radiology Division Reading Room, in order to receive their login credentials for Epic's EMR software and their PACs workstation interface.

246. Relator was surprised to learn at this meeting with the Epic representatives in early July 2018, that each Fellow was receiving access to not one, but *two*, Epic accounts. One

account, explained the Epic representatives, was their "Fellow account," where they would enter radiology interpretations to be signed off on by Attending/Teaching Physicians pursuant to their Fellowship training curriculum.

247.    Each account has a different Identification Number, a different "Login ID," and a different password.

248.    A second account, the Epic Systems representatives explained to Relator in July 2018, was the Fellows' "billing account," which, as "Billing Fellows," they would use to review and "sign off" on interpretations completed by Residents in lieu of review by an Attending/Teaching Physician.

249.    While Relator and two of the three other Fellows, Chelsea Jerenko and Casey Schaffer, received the Billing Fellow designation and separate account, the fourth Fellow, Mikhail Sebaaly, did not, because his medical school and residency training occurred outside the United States and he is therefore not yet licensed to practice medicine in Iowa. Thus, Dr. Sebaaly is treated as the equivalent of a Resident for billing purposes in that his work must be supervised, reviewed, and approved by a licensed Attending/Teaching Physician.

250.    With the exception of these credentials and the software's designation of the Fellows as "Attending physicians" and "staff" when entering records using the billing account, the software interfaces for the accounts are identical.

251.    Relator was not quite sure what to make of the "billing account" and "Billing Fellow" nomenclature until the second week of his UIHC Fellowship, when Relator learned from Defendant Dr. Bennett on or about July 11, 2018 that the "hands on training" marketed by the Department in their recruitment of prospective Fellows referred in material part to 15 and 24-hour "general call" shifts during which they would function and bill the Government for the

provision of GC-modifier-appended supervised services as if they were actually

Attending/Teaching Physician Radiologists and not mere Fellows.

252.    The process, described in the above paragraph, makes the Radiology Fellows

solely responsible for the "staffing out" of Residents by providing the actual clinical review and

supervision of interpretations originally completed by Residents.

253.    Throughout the course of a year, about 40 to 50 radiologists, including mostly

Attending/Teaching Physicians from the nine (9) sections of the UIHC Radiology Department

participate in the "staffing out" of "general call" preliminary reports completed by Resident

Radiologists. This includes the three MSK Fellows as well as one Fellow from the Body section.

254.    However, in fact, neither the Fellows nor the Attending/Teaching Physicians ever

actually speak to the on-call Residents about their on-call interpretations or preliminary reports.

Moreover, the Attending/Teaching Physicians who ultimately bill for the services rendered by

the Residents and/or Fellow do not actually perform the "staffing-out" function required for the

added GC billing modifier. Rather, as illustrated below, they routinely utilize "batch signing,"

electronically approving reports for billing purposes without actually reviewing them.

255.    In July 2018, Defendant Dr. Bennet told Relator: "We have you staffing

[supervising /teaching] plain film." Relator was startled to learn that he was effectively being

ordered to falsify billing documents to indicate that he provided direct supervision of Residents

whose reports are eventually billed under the name of an Attending/Teaching Physician who

never reviews the interpretation.

256.    During that first shift in July 2018 when UIHC and Defendant Drs. Ohashi and

Bennett required Relator to review image interpretations and to bill as if they were

Attending/Teaching Physicians, Relator learned from several Residents that UIHC had only in

the prior year begun to require Fellows to review Residents' imaging studies and to bill as if an Attending/Teaching Physician Radiologist had actually interpreted the image.

257.    This practice of Fellows reviewing, or "staffing out," Residents as if the Fellows were Attending/Teaching Physicians was a new arrangement. The 2018 class of Musculoskeletal Radiology Fellows being the first class used as "Attending Physicians" for purposes of the Medicare "Teaching Physician" billing requirements.

258.    UIHC Program Coordinator Courtney Bork confirmed verbally in July 2018 and via email on September 6, 2018 that UIHC pays such "Billing Fellows" an additional $10,000 "stipend" for their "Billing Fellow" services.

259.    In short, Defendant UIHC, through its Radiology Department leadership including Defendant Drs. Ohashi and Bennett, fraudulently evades federal regulations regarding Attending/Teaching Physician billing requirements. The evasion is done by requiring Fellows to review the Residents' interpretations of images but to bill those interpretations as if the review and supervision was performed by an Attending/Teaching Physician Radiologist as required by the Government to bill services rendered originally by a Resident to a Beneficiary.

260.    That is, to insulate their Attending/Teaching Physicians, Defendant UIHC's Musculoskeletal Division has, as described above, recently enlisted its unwitting Fellows, including Relator, to review and sign off on the final image interpretations without anyone providing any actual supervision of the Residents.

261.    The Attending/Teaching Physicians, however, as illustrated below, nonetheless bill for the interpretations as if they provided the required supervision.

262.    Substituting Fellows for Attending/Teaching Physician Radiologists and falsifying medical and billing records so that the Government is presented with false claims

indicating, via the above-described CPT modifier "GC," that the images were actually

supervised, reviewed, and interpreted by Attending/Teaching Physicians with Residents bilks the

Government, which not only pays for the services rendered to the Beneficiary but also pays

UIHC, as described above, additional funds for graduate medical education (GME).

263.    Defendant UIHC not only enriches itself at the Government's expense by falsely

supporting those claims for payment of Residents' services which it falsely represents as

Teaching/Attending Physician services, but also by freeing up Attending/Teaching Physician

Radiologists' time for other billing.

264.    MSK Fellows are thus used by UIHC to complete high-volume review of plain

film radiograph interpretations completed by Residents without supervision.

265.    UIHC then falsely appends the name of an actual faculty-staff Attending/

Teaching Physician to the medical record, despite the fact that such Attending/Teaching

Physician never actually views the diagnostic images.

266.    Moreover, while the Fellows review the on-call Residents' reports during the 15

and 24-hour, overnight "general call" shifts, they do not provide any supervision or even review

the report "with the Resident," as required by 42 C.F.R. § 415.180.

267.    Rather, the Fellows act merely as a screening mechanism and a check on potential

malpractice liability, with UIHC hoping that Fellows' skills will suffice to catch the inevitable,

dangerously inaccurate interpretations and misdiagnoses often made by the Residents during the

more dangerous overnight on-call shifts.

268.    Thus, in addition to false claims for Medicare Part B payments, Defendant

UIHC's Fellows-Reviewing-Residents-Scheme results in the Government paying GME funds, as

described above, to UIHC for the cost of training the Residents, when in fact, no training is

taking place at all during the approximately 100 hours per week of on-call shifts worked by the Residents.

269.     Although most of Relator's direct knowledge pertains to his role and the role of his fellow Musculoskeletal Fellows and Musculoskeletal Attending/Teaching Physicians like Defendants Ohashi and Bennett, the refusal to supervise Residents during the overnight general call shifts constitutes a program-wide scheme: Residents receive no supervision and no in-person review of their imaging interpretation services during the on-call shifts from anyone during these shifts or afterwards.

270.     Indeed, while the Musculoskeletal Division is, on information and belief, the only UIHC Radiology Division to use Fellows to review unsupervised Residents' interpretations, the other eight UIHC divisions' Attending/Teaching Physicians, based on Relator's direct observation of and interactions with them, are no different than the Musculoskeletal Division's Attending/Teaching Physicians in that they also refuse to comply with 42 C.F.R. § 415.180's supervision requirements.

271.     Indeed, the Attending/Teaching Physicians in each of the nine (9) Divisions of Defendant UIHC's Radiology Department are all required under 42 C.F.R. § 415.180 to have "reviewed the resident's interpretation" in order to receive "[p]hysician fee schedule payment." Based on his experience staffing out general call and as illustrated below, Relator has observed dozens of examples of Attending/Teaching Physicians from each of Defendant UIHC's Radiology Department's Divisions engaging in fraudulent batch signing.

272.     The following are specific examples of the multitude of Beneficiaries who received diagnostic imaging services, including image interpretation performed independently by GME-funded Residents, for which UIHC submitted claims to the Government supported by

medical records falsely indicating that the interpretation was reviewed by an Attending/Teaching

Physician Radiologist, such as Defendants Bennet and Ohashi:

a. Beneficiary J.S.:

    i.    On November 21, 2018, Beneficiary J.S.'s spine CT images were

        interpreted by a Resident whose report was then reviewed by Relator,

        the "billing fellow."

    ii.    However, for Beneficiary J.S., UIHC submitted the claim with

        Defendant Dr. Bennett listed as the "attending physician," even though

        contemporaneous medical record documentation expressly indicates

        that Relator was acting as the "attending" and "staff" physician.

    iii.    No one ever reviewed the Resident's report with him to ensure he

        learned from any mistakes, including Beneficiary J.S.'s two lumbar

        spinal fractures, which the Resident had failed to detect and which

        may have likely resulted in increased medical expenses for the

        Taxpayers due to potential complications of the missed diagnosis.

b. Beneficiary B.W.:

    i.    On November 16, 2018, MRI images of Beneficiary B.W.'s foot were

        interpreted by a Resident, Michael Lucin, whose report was then

        purportedly reviewed by Relator nearly three days later on November

        19, 2018, the "billing fellow," and no one else.

    ii.    However, UIHC submitted the claim for services to Beneficiary B.W.

        with Defendant Dr. Ohashi as the "attending physician," even though

contemporaneous medical record documentation expressly indicates

that Relator was acting as the "attending" and "staff" physician.

iii.    No one ever reviewed the Resident's report with him to ensure he

learned from any mistakes, including Beneficiary B.W.'s undiagnosed

bone infection, which, if not detected by Relator, may have likely

resulted in the Beneficiary B.W. losing her foot and, at the same time,

causing heightened medical expenses to be shouldered by the

Taxpayers.

c.  Beneficiary B.R.:

i.      On July 18, 2018, Beneficiary B.R.'s hip radiographs were interpreted

by first-year Resident, Scott Muffly, whose report was then reviewed

by Relator, the "billing fellow," and by no one else.

ii.     However, UIHC submitted the claim for services to Beneficiary B.R.

with Defendant Dr. Bennett as the "attending physician," even though

contemporaneous medical record documentation expressly indicates

that Relator was acting as the "attending" and "staff" physician.

iii.    No Attending/Teaching Physician ever reviewed the Resident's report.

d.  Beneficiary A.W.:

i.      On August 24, 2018, Beneficiary A.W.'s shoulder radiograph was

interpreted by unlicensed Fellow Mikhail Sebaaly whose report was

then reviewed by Relator, the "billing fellow," and by no one else.

ii.     However, UIHC submitted the claim for services to Beneficiary A.W.

with Defendant Dr. Bennett as the "attending physician," even though

contemporaneous medical record documentation expressly indicates that Relator was acting as the "attending" and "staff" physician.

    iii.    No Attending/Teaching Physician ever reviewed the Resident's report about Beneficiary A.W.

e.    Beneficiary R.H.:

    i.    On August 24, 2018, Beneficiary R.H.'s hand radiograph was interpreted by unlicensed fellow Mikhail Sebaaly whose report was then reviewed by Relator, the "billing fellow," and nobody else.

    ii.    However, UIHC submitted the claim for services to Beneficiary R.H. with Defendant Dr. Bennett as the "attending physician," even though contemporaneous medical record documentation expressly indicates that Relator was acting as the "attending" and "staff" physician.

    iii.    No Attending/Teaching Physician ever reviewed the unlicensed Fellow's report about Beneficiary R.H.

f.    Beneficiary C.P.:

    i.    On September 9, 2018, Beneficiary C.P.'s shoulder CT image was interpreted by Resident Renato C Ferreira Da Silva whose report was then reviewed by Relator, the "billing fellow," and no one else.

    ii.    However, UIHC submitted the claim for services to Beneficiary C.P. with Attending/Teaching Physician Dr. Howard O'Rourke as the "attending physician, even though

contemporaneous medical record documentation expressly

indicates that Relator was acting as the "attending" and

"staff" physician.

iii.    No Attending/Teaching Physician one ever reviewed the

Resident's report about Beneficiary C.P.

273.    On August 24, 2018, Relator was working a routine day shift from 7:30 am. to

10:00 pm. During this time, Relator was tasked with reviewing 221 radiograph plain film studies

completed by Bradley Kvamme and Marisol Sepulveda, first and second-year Residents,

respectively.

274.    For each of these 221 studies referenced above, Relator is listed in the patients'

charts as the "attending physician," even though he is only a Fellow student and not an attending

or teaching physician.

275.    However, also for each of these 221 studies, Attending/Teaching Physicians such

as Defendant Drs. Ohashi and Bennett subsequently appended their own names to the reports,

despite never seeing the images, much less supervising their creation or reviewing them "with

the Resident."

276.    Approximately 50-60% of these referenced 221 image interpretations were for

Government Beneficiaries.

277.    These Beneficiaries' studies from the August 24, 2018 day shift were

subsequently billed to the Government by Defendant UIHC with the billing paperwork falsely

indicating that an actual Attending/Teaching Physician Radiologist, such as Drs. Bennett or

Ohashi reviewed the interpretations, despite the fact that they never reviewed the image.

278.    Because this Fellows-Reviewing-Residents aspect of the unsupervised-residents

scheme is relatively new, several Residents have noticed and voiced concerns about not getting

the benefits of actual medical training from Attending/Teaching Physician Radiologists, which

the Government is paying UIHC to provide.

279.    For example, on August 18, 2018, Resident Muhammad Abdul-Wahab expressly

asked Relator if his patient image readings could be reviewed "by an actual attending doctor."

280.    Relator then spoke to Defendant Dr. Ohashi later on August 18, 2018, who

insisted that Relator sign off on Resident Abdul-Wahab's radiology interpretation, stating "you

need to staff him out," even after Relator pointed out that Attending/Teaching Physician

Radiologist Dr. Howard O'Rourke was listed as the Attending/Teaching Physician on the

patient's medical record.

281.    Defendant Dr. Ohashi responded during the same conversation with Relator on

August 18, 2018 by ordering Relator to meet with him in his office immediately, where he

chastised Relator for being reluctant to be the sole reviewer of Residents' patient image

interpretations.

282.    At the conclusion of his meeting with Relator on August 24, 2018, Defendant Dr.

Ohashi emphatically ordered Relator to "get back to work" and to continue impersonating an

Attending/Teaching Physician for purposes of billing Government Beneficiaries.

283.    On October 1, 2018, Residency Program Director Dr. Bruno Policini revealed the

motivation for Defendant's UIHC's Fellows-Reviewing-Residents-Scheme during a meeting

with Relator, the three other Fellows, and Fellowship Program Coordinator Courtney Bork,

stating that while he recalled "the good old days when we [Attending/Teaching Physicians]

would sit by the Residents...[to review their image interpretations, per Medicare's condition of

payment],” UIHC has decided to *“double up”* on the number of Radiology Residents to keep up with the hospital’s work flow, and Fellows’ efforts are needed to “fill in” for actual Attending/Teaching Physicians.

284.     In addition to being an express violation of 42 C.F.R. § 415.170’s condition of payment for Attending/Teaching Physicians, UIHC’s scheme reflects an astounding disregard for patient safety and correspondingly for Taxpayer liability for enhanced medical expense for complications resulting from each missed diagnosis.

285.     Indeed, during just a single shift of reviewing Residents’ work on September 30, 2018, Relator “caught” the following diagnoses that were missed by Residents:

    a.  Pneumothorax (collapsed lung);

    b.  Ileus/obstruction (bowel obstruction, which can be a surgical emergency);

    c.  L2 (2nd lumbar spine vertebral body) fracture;

    d.  Pneumonia in a patient with COPD;

    e.  Multiple left sided rib fractures in an elderly patient who had fallen;

    f.  A humeral fracture, called normal, necessitating admission to the hospital because the providers could not explain the patient’s pain.

286.     It is unknown how many diagnoses Relator missed or got wrong during his September 30, 2018 shift, given that no Attending/Teaching Physician Radiologist ever reviewed any of those images, despite their representations to the Government that they had done so.

287.     While Relator is a skilled radiologist, he is not a “Teaching Physician;” neither are the other Fellows.

288.    On December 3, 2018, Relator asked Attending/Teaching Physician Dr. Howard O'Rourke what UIHC's basis was for attaching the GC supervision modifier to claims for services rendered by on-call Residents who, in fact, received no supervision whatsoever.

289.    In response to Relator's December 3, 2018 question, Dr. O'Rourke explained that the practice was widespread and unavoidable. Relator replied that Fellows could stop falsely documenting supervision, but Dr. O'Rourke replied: "Yea, how much money would we lose though?"

290.    Similarly, on December 10, 2018, Relator asked in an email for UIHC's Department of Radiology Administrator Tyler Artz to explain why the GC supervision modifier was being regularly added, stating:

> On general call, we put GC modifiers on all studies prelimmed by the overnight resident. Yet, as I understand, the GC modifier indicates that "direct teaching of resident by teaching physician." Since we don't supervise, or staff out the resident, or review the reports with the resident, I am a bit concerned that we are documenting/billing for services that we don't actually provide.

291.    After indicating he would consult with UIHC's "certified coders," Artz explained that Defendant has programmed its software so that the supervision modifier "automatically populates," but only for billing Government Beneficiaries, "when the service provider is a Resident." Artz never addressed Relator's actual question about why the supervision modifier would be used to enhance billing Taxpayers when, in fact, no supervision was being provided.

292.    Likewise, although the Relator and his fellow MSK Fellows, do their best to actually review and independently interpret the Resident-generated preliminary reports they are tasked with staffing out, the same cannot be said of Defendant UIHC's Attending/Teaching Physicians.

293.     According to time-stamped radiology records reviewed by Relator, commonly referred to as "audit trails," many of Defendant UIHC's Attending/Teaching Physicians engage in "batch signing" in order to complete their assigned staff-out duties.

294.     "Batch signing" refers to the practice of logging in to the radiology PACS software and, rather than individually clicking, scrolling through, and reviewing each image along with a patient's medical history and other information relevant to the accuracy of the Resident's preliminary report, simply "clicking and dragging" the mouse over the entire "batch" of images and reports in order to highlight them, and then clicking "sign" without actually performing any review.

295.     The term "batch signing" is a radiology industry colloquialism, not a legal term. For example, in discussing the challenge posed by an increased workload as a result of advances in diagnostic imaging technology increasing the number and complexity of images to be reviewed and interpreted, Dr. Kirk Banerian provided the following helpful illustration of batch-signing's underlying causes and motives in a 2008 opinion piece submitted to the medical journal, Applied Radiology:

> We can, perhaps, rationalize a number of less desirable, possibly perilous, but nonetheless tempting work shortcuts. It is possible to find a reason not to review every image in a study. Perhaps, we may rationalize that there are simply too many images in a chest CT for "possible pulmonary embolism" to take the time to also carefully assess the included lung parenchyma for a pulmonary nodule or for interstitial lung disease. After all, if the study was requested to assess for pulmonary embolism, shouldn't that be where we put all our effort? Can't we just skip or skim through the lung windows? A CT angiographic study of the carotid arteries usually requires 500 images …Should we spend time worrying about all this other stuff?....
>
> Rationalizations like these are most often clustered near the end of the day. Hey, it's 4:30 and we've got to "clean up" these cases before we leave. Memo from the top: "You must sign all of your

> dictated reports before leaving work each day." Perhaps, I can just proofread the report's impression for accuracy before signing. That's good enough, isn't it? That will save lots of time. An error in the history, comparison, procedure, or findings portions of the report isn't really that important, is it? They probably won't even look at that part. It's been a long day, and it's now past 6:00; **I'll just batch sign/approve** these last 37 reports. I'm too burned out to proofread them now"….Another dangerous shortcut is taking insufficient time to correlate current findings with prior relevant studies. In the long run, this does not save time and can cause harm to the patient.

Banerian, *Guest Editorial*, APPL. RAD. (March 21, 2008), https://www.appliedradiolog.com/articles/guest-editorial.

296.     As explained above, typical general call shifts can generate at least 200 preliminary reports completed by Radiology Residents. While some of these reports are "routine," with no life-threatening implications, others are complex, and whether a patient lives or dies can hinge on the accuracy and promptness of the interpretation.

297.     Generally, the Fellow or the Attending/Teaching Physician(s) assigned to staff out general call begin reviewing available reports before they leave the hospital, in the evening, and then complete them the following morning. Because there is typically an increase in reports to be reviewed in the morning, due to imaging ordered by the emergency room overnight, the majority of staffing out occurs early in the morning, beginning around 6:00 AM.

298.     The time it takes a provider to complete a staff-out session depends not only on the number of reports they need to review, but also on the number and nature of any errors they detect, which may require them to locate and correspond with the provider who ordered the image in addition to correcting and approving the report.

299.     Relator does not batch sign, and he estimates that, based on his knowledge and personal experience, the fastest that even the most experienced radiologist could complete the

review and approval of an average batch of general call reports, which would be anywhere from 75 – 100 studies, is about 2.5 to 3 hours, i.e. about 30 studies per hours. Relator generally takes 3-5 hours to complete his staffing out. Thus, Relator generally takes at least 2 minutes to complete his review and interpretation of a simple exam; and up to 5 minutes to complete a more complex exam.

300.    In stark contrast, the staff-out completion rates of many of Defendant UIHC's Attending/Teaching Physicians in the Radiology Department reflect super human speeds, purportedly reviewing 100-150 reports per hour at a physically impossible rate of 1 report every 36 seconds.

301.     Indeed, each report takes at least 15-20 seconds to load and become viewable once clicked.

302.    Even more telling are the many instances in which time-stamped patient records indicate multiple studies being reviewed and signed at the *exact same* time for <u>different</u> patients, another physical impossibility, given that Defendant's UIHC PACS software does not allow users to open imaging studies for more than one patient at a time.

303.    The Defendant UIHC Attending/Teaching Physicians who engage in this routine batch-signing of diagnostic radiology reports generated preliminarily by Resident Radiologists during general call include Drs. Brian F. Mullen, Joan Maley, Leonel Vasquez, Nobuhiro Fujita, Takahashi Sato, Jack Kademian, and Bruno Policeni. Defendant Drs. Ohashi and Bennett are aware of this practice and intentionally tolerate it in order to ensure that the UIHC Radiology Department, which they lead, continued to generate as much revenue as possible.

304.    Specific examples of the batching signing engaged in by these seven UIHC Attending/Teaching Physicians include the following:

a. On September 19, 2018, Defendant Dr. Brian F. Mullan falsely claimed to have independently reviewed, interpreted, and signed between 7:56 AM and 8:30 AM 85 different preliminary patient reports completed by Radiology Residents on general call the night before, while also performing his regular, daytime, incoming clinical work. The rate of approximately 26 seconds per report is physically impossible and can be explained only by batch signing.

b. On December 4, 2018, Defendant Dr. Brian F. Mullan falsely claimed to have independently reviewed, interpreted, and signed between 6:55 AM and 7:15 AM approximately 100 different preliminary reports completed by Radiology Residents on general call the night before. The rate of approximately 12 seconds per report is physically impossible and can be explained only by batch signing.

c. On February 11, 2019, Defendant Dr. Leonel Vasquez falsely claimed to have independently reviewed, interpreted, and signed between 7:25 AM and 8:05 AM 112 different preliminary reports completed by Radiology Residents on general call the night before, while also performing his regular, daytime, incoming clinical work. The rate of approximately 21 seconds per report is physically impossible and can be explained only by batch signing.

d. On March 8, 2019, Defendant Dr. Joan Maley falsely claimed to have independently reviewed, interpreted, and signed between the hours of 7:00 AM and 8:00 AM 80 different preliminary reports completed by Radiology Residents on general call the night before, while also performing her regular,

79

daytime, incoming clinical work. The rate of approximately 45 seconds per
report is physically impossible and can be explained only by batch signing.

e. On March 12, 2019, Defendant Dr. Nobuhiro Fujita falsely claimed to have
independently reviewed, interpreted, and signed between 7:19 AM and 8:13
AM 82 different preliminary reports completed by Radiology Residents on
general call the night before, while also performing his regular, daytime,
incoming clinical work. The rate of approximately 39 seconds per report is
physically impossible and can be explained only by batch signing.

f. On March 13, 2019, Defendant Dr. Joan Maley falsely claimed to have
independently reviewed, interpreted, and signed between 6:20 AM and 8:00
AM 130 different preliminary reports completed by Radiology Residents the
night before, while also assigned to review at least 20 complex cross-sectional
exams for the Neuroradiology section. The rate of approximately 40 seconds
per report is physically impossible and can be explained only by batch
signing.

g. On April 25, 2019, Defendant Dr. Bruno Policeni (who also serves as UIHC's
Radiology Residency Program Director and Vice Chair of Education) falsely
claimed to have independently reviewed, interpreted, and signed between 7:54
AM and 8:25 AM 60 different preliminary reports completed by Radiology
Residents on general call the night before, while also performing his regular,
daytime, incoming clinical work. The rate of approximately 30 seconds per
report is physically impossible and can be explained only by batch signing.

h. On May 1, 2019, Defendant Dr. Takahashi S. Sato falsely claimed to have independently reviewed, interpreted, and signed between 7:55 AM and 8:06 AM, and between 8:24 AM and 8:35 AM, twenty (20) and thirty (30) different preliminary reports completed by Radiology Residents on general call the night before, while also performing his regular, daytime, incoming clinical work. The rate of approximately 26 seconds per report is physically impossible and can be explained only by batch signing.

i. On May 8, 2019, Defendant Dr. Jack Kademian falsely claimed to have independently reviewed, interpreted, and signed between 7:27 AM and 8:00 AM 70 different preliminary reports completed by Radiology Residents the night before. The rate of approximately 29 seconds per report is physically impossible and can be explained only by batch signing

305. For each of the reports referenced above, the UIHC Attending/Teaching Physicians click "sign," which corresponds with an automatically generated attestation of having "personally reviewed" each image and preliminary report.

306. Once falsely signed, these reports cause the submission by UIHC's billing department of many claims for payment to Medicare, Medicaid, or other federally funded healthcare programs, based on Defendant UIHC's processes and patient population, as described above.

307. Thus, the batch-signing practices of Defendant UIHC's Radiology Department result in the submission **of dozens of false claims per day**.

308. An additional example further underscores the brazenness of Defendants' Batch Signing Scheme:

309.    On May 24, 2019, Defendant Dr. Leonel Vasquez falsely claimed to have

reviewed and approved 37 studies between 7:50 AM and 8:19 AM (about 47 seconds per exam)

and 100 studies between 11:42 AM and 12:35 AM (about 32 seconds per exam),

310.    During this session, Defendant Vasquez actually signed off on the exams of

multiple Beneficiaries—B.M, B.D, C. H, and B.V.— at **exactly the same time** as at least one

other patient. As described above, it is physically impossible, both with regard to human physical

capacity and the capabilities of Defendant UIHC's software, to simultaneously review and

interpret two different patients' sets of images.

311.    In addition to wasting Taxpayer dollars, the batch-signing scheme places patients

at risk of serious harm in light of the examples above of diagnostic errors by on-call Resident

Radiologists, which Relator believes to be representative of an overall "miss rate" or error rate,

that is well above the national average.

312.    Defendant UIHC's management is well aware of the rampant batch signing in the

Radiology Department.  On or about May 24, 2019, Relator showed examples of batch signing

like those described above to Defendant UIHC's Clinical Assistant Professor of Radiology,

Attending/Teaching Physician Howard O'Rourke who acknowledged disbelief that an actual

review could "get done so quickly."

313.    Defendant UIHC's Attending/Teaching Physicians are compensated based in

large part on their clinical productivity, as measured in "relative value units," or RVUs, which

are tied directly to the volume of billable procedures performed. Thus, the more studies they

"sign off" on, the more money they—and UIHC—make.

314.    Underscoring the materiality of this supervision, review, and approval

requirement is the $2.2 million settlement announced in June 2016 by the United States on

resolution of allegations that certain University of Missouri-Columbia Attending/Teaching

Physicians had billed for "reports prepared by resident physicians when, in fact, they had not

reviewed those images." *See Department of Justice, U.S. Attorney's Office Press Release*, dated

June 30, 2016, https://www.justice.gov/usao-wdmo/pr/university-missouri-columbia-agrees-pay-

united-states-22-million-settle-alleged-false.

### G.  **Defendant's Unsupervised Spinal Tap Scheme**

315.    Like its Radiology Residents, Defendant UIHC's Neuroradiology Fellows are

ACGME-accredited. Accordingly, Defendant UIHC can only bill for their services if an

Attending/Teaching Physician is "present during the key portion of any service or procedure for

which payment is sought." 42 C.F.R. § 415.172(a); 415.152.

316.    Further, the presence of the Attending/Teaching Physician "at the time the

services is furnished" must be documented in the Beneficiary's medical record. 42 C.F.R.

§ 415.172(b).

317.    Just as Musculoskeletal Radiology is a subspecialty focused on orthopedic issues,

Neuroradiology is a subspecialty of radiology focusing on the diagnosis and characterization of

abnormalities of the central and peripheral nervous system, spine, head, and neck using

neuroimaging techniques.

318.    One of these techniques is called a Spinal Lumbar Puncture Diagnostic (CPT

Codes 77003 and 62270) (also known as a spinal "tap"), a relatively invasive procedure in which

a needle is inserted into a patient's spine to obtain cerebrospinal fluid for testing.

319.    As of June 20, 2019, Medicare pays approximately $91.68 for the puncture

procedure (CPT 77003) and $74.35 for the corresponding diagnostic services (CPT 62270) when

each are performed in a hospital setting by a Teaching Physician.

320.    During the day and until about 10:00 PM, Defendant UIHC's four

Neuroradiology Fellows perform Lumbar Punctures under the direct supervision of

Attending/Teaching Physicians from the Neuroradiology Division of Defendant UIHC's

Radiology Department, including Dr. Jack Kademian.

321.    However, after 10:00 PM, Neuroradiology Fellows perform anywhere from 6 to

12 Lumbar Punctures per month during overnight general call shifts with no Attending/Teaching

Physician present for **any** portion of the procedure.

322.    The next morning, Defendant UIHC's Attending/Teaching physicians falsify

patient medical records by representing, via the inclusion of the "GC" modifier, that they were

"present for the key portions of the procedure, and immediately available for the remainder of

the procedure;" and then cause the claim to be submitted for payment as if they were, in fact,

present and immediately available.

323.    This practice is longstanding. Based on Relator's conversations with past and

current Neuroradiology Fellows and Attending/Teaching Physicians, Defendant UIHC's

Radiology Department has been engaged in this scheme since no later than 2012.

324.    Representative examples of Defendant UIHC's Unsupervised Lumbar Puncture

Scheme include the following:

      a.   Medicare Beneficiary E.C.

          i.   On May 26, 2019, Neuroradiology Fellow Adam Bryant performed a

               Lumbar Puncture procedure on Beneficiary E.C.

    ii.    No Defendant UIHC Attending/Teaching Physician was present while Dr. Bryant performed the procedure.

    iii.    Nonetheless, Defendant UIHC Attending/Teaching Physician Dr. Jinha Park billed for the procedure the next morning as if he had been present and supervising, using the GC modifier.

  b.  Iowa Medicaid Beneficiary M.A.

    i.    On May 11, 2019, Neuroradiology Fellow Adam Bryant performed a Lumbar Puncture procedure on Iowa Medicaid Beneficiary M.A., a juvenile.

    ii.    No Defendant UIHC Attending/Teaching Physician was present while Dr. Bryant performed the procedure.

    iii.    Nonetheless, Defendant UIHC Attending/Teaching Physician Michael D'Alessandro billed for the procedure the next morning as if he had been present and supervising, using the GC modifier.

325.    In March 2019, Defendant UIHC's Radiology Residency Director Dr. Bruno Policeni asked Relator, as a fully licensed, non-ACGME-accredited fellow, to supervise certain Lumbar Puncture procedures performed by Neuroradiology Fellows.

326.    Incredibly, the request was for a Fellow in the Musculoskeletal subspecialty to supervise a Fellow being specialty trained in the Neuroradiology subspecialty who would have more experience than the "supervising" Fellow.

327.    On March 1, 2019, when Relator pointed out in an email to Dr. Policeni that Relator knew nothing about Lumbar Puncture and had never seen one, let alone performed one,

Dr. Policeni explained, "The lumbar punctures are performed by the neurofellows and supervised by the general staff up to 8 pm, after that the fellows perform the procedures by themself."

328.     On March 27, 2019, Relator discussed the propriety of asking MSK Fellows to supervise Neuroradiology Fellows' Lumbar Punctures with Dr. Kademian. Dr. Kademian explained:

> **Well, that's not the point...we just need someone there so we can bill for it until 10 pm. After 10 pm, we just don't bill for them**.

329.     The first part of the above statement by Dr. Kademian is telling, insofar as it reveals Defendant UIHC's knowledge and the materiality of the supervision requirements described above.

330.     The second part of his statement is simply false. As illustrated above, Defendant UIHC does indeed bill for Lumbar Puncture procedures performed overnight by unsupervised Neuroradiology Fellows.

331.     On April 4, 2018, after Relator emailed Dr. Policeni to confirm Relator's intent to "respectfully decline" the request that he supervise the Neuroradiology Fellows due to his "concerns about being able to safely staff these (as I have done zero)," Dr. Policeni replied, "Ok, we will perform these procedures without your supervision."

332.     The Unsupervised Spinal Tap Scheme is a department-wide scheme in Defendant UIHC's Department of Radiology in which all Attending/Teaching Physicians have personally engaged, including Defendant Drs. Bennett, Ohashi, Policeni, Fujita,  Kademian, Maley, Mullan, Sato; and Vasquez.

## IX.    COUNTS

### COUNT ONE

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Defendant's Comparison X-Ray Scheme: False Claims for "Comparison" Radiology
### Services not Ordered or Medically Indicated

333.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

334.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

335.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

336.    By engaging in the conduct set forth herein relating to X-ray overbilled Radiology Services, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

337.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid were the Government aware of Defendants' overbilling for diagnostic X-ray and X-ray-guided radiology services.

338.    By reason of Defendants' acts and omissions, the United States has suffered substantial actual damages.

## COUNT TWO

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
**Defendants' Long Leg View Scheme: False Claims for Diagnostic Imaging Services for Femur and Tibia-Fibula Not Actually Provided**

339.     Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

340.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

341.     31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

342.     By engaging in the conduct set forth herein relating to MRI imaging services that were billed for but not in fact provided, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

343.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid were the Government aware of Defendants' overbilling for diagnostic X-ray and X-ray-guided radiology services.

344.     By reason of Defendants' acts and omissions, the United States has suffered substantial actual damages.

## COUNT THREE

**Violations of the Federal False Claims Act
31 U.S.C. § 3729(a)(1)(A)
Defendants Myeloma MRI Scheme: False Claims for Payments for Diagnostic MRI
Services Not Actually Provided to Cancer Patients**

345.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

346.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

347.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

348.    By engaging in the conduct set forth herein relating to the Myeloma MRI Scheme with false claims for payments for Diagnostic MRI Services not actually provided to cancer patients, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

349.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid were the Government aware of Defendants' intentional omission of the MRI sequences necessary for the examination to be as comprehensive as Defendants represented to Beneficiaries and the Government.

350.    By reason of Defendants' acts and omissions, the United States has suffered substantial actual damages.

## COUNT FOUR

### Violations of the Federal False Claims Act
**31 U.S.C. § 3729(a)(1)(A)**
**Defendants Useless 3-D Reconstruction Scheme: False Claims for Payments for Diagnostic
3-D Reconstruction Interpretations Not Actually Provided**

351.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

352.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

353.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

354.    By engaging in the conduct set forth herein related to the useless 3-D reconstruction scheme by making false claims for payments for diagnostic 3-D reconstruction interpretations not actually provided, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

355.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid were the Government aware of Defendants' false claims for medically unnecessary and/or never actually performed 3-D Reconstruction diagnostic radiology services.

356.    By reason of Defendants' acts and omissions, the United States has suffered substantial actual damages.

## COUNT FIVE

### Violations of the Federal False Claims Act
**31 U.S.C. § 3729(a)(1)(A)**
**Defendants' Batch Signing Scheme: False Claims for Payments for Services Rendered by Unsupervised Radiology Residents as if Rendered by Attending/Teaching Physicians**

357.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein

358.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

359.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

360.    By engaging in the conduct set forth herein related to the Batch Signing Scheme by making false claims for payments for services rendered by unsupervised radiology Residents as if rendered by Attending/Teaching Physicians, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

361.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid had the Government known of Defendants' respective failures to require and provide the required supervision, review, and independent interpretation and approval  of diagnostic radiology reports generated by Radiology Residents despite falsely attesting to having done so.

362.    By reason of Defendants' acts, the United States has suffered substantial actual damages.

## COUNT SIX

### Violations of the Federal False Claims Act
**31 U.S.C. § 3729(a)(1)(A)**
**Defendant UIHC's Unsupervised Spinal Tap Scheme: False Claims for Services Rendered
by Fellows as if Rendered by Attending/Teaching Physicians**

363.    Relator realleges and incorporates by reference the allegations of all previous
paragraphs as if restated herein.

364.    This is a claim for treble damages and penalties under the False Claims Act, 31
U.S.C. §§ 3729, *et seq*., as amended.

365.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or
causes to be presented a false or fraudulent claim for payment or approval" is liable under the
Act.

366.    By engaging in the conduct set forth herein related to UIHC's unsupervised
Spinal Tap Scheme and by making false claims for services rendered by Fellows as if rendered
by Attending/Teaching Physicians, Defendants have knowingly presented or caused to be
presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

367.    The Government, unaware of the falsity of the records, statements, and claims
made or caused to be made by Defendant UIHC Attending/Teaching Physicians, paid and
continues to pay the claims that would not have been paid had the Government known of
Defendant UIHC's failures to require and provide supervision of the Lumbar Puncture
procedures performed by its Neuroradiology Fellows despite falsely attesting to having done so.

368.    By reason of Defendants' acts, the United States has suffered substantial actual
damages.

## COUNT SEVEN

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
**False Claims for Graduate Medical Education for Unsupervised Radiology Residents and
Neuroradiology Fellows**

369.     Relator realleges and incorporates by reference the allegations of all previous
paragraphs as if restated herein.

370.     This is a claim for treble damages and penalties under the False Claims Act, 31
U.S.C. §§ 3729, *et seq*., as amended.

371.     31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or
causes to be presented a false or fraudulent claim for payment or approval" is liable under the
Act.

372.      By engaging in the conduct set forth herein, related to Graduate Medical
Education for unsupervised radiology Residents and neuroradiology Fellows, Defendants have
knowingly presented or caused to be presented false or fraudulent claims for Part A GME
reimbursement in violation of 31 U.S.C. § 3729(a)(1)(A).

373.     The Government, unaware of the falsity of the records, statements, and claims
made or caused to be made by Defendants, paid and continues to pay the claims that would not
be paid had the Government known of Defendants' respective failures to require and provide
sufficient supervision and review of diagnostic radiology services rendered by Radiology
Residents.

374.     By reason of Defendants' acts, the United States has suffered substantial actual
damages.

## COUNT EIGHT

### Violations of the Iowa False Claims Act
**Iowa Code Ann. §§ 685.1-.7**
**False Claims for Payments for Unsupervised Resident Radiologist Services**

375.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

376.    This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code Ann. §§ 685.1-.7

377.    By virtue of the misrepresentations and submissions of non-reimbursable claims for false claims described in Counts One through Six above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

378.    The Iowa Medicaid Program, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid had the Government known of Defendants' respective failures to comply with conditions of payment for each of the diagnostic services subjected to the  above-referenced schemes.

379.    By reason of these payments, the Iowa Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT NINE

**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Defendants' Falsification of Medical Records, Billing Records, and Cost Reports in Support of False Claims**

380.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

381.    31 U.S.C. § 3729(a)(1)(B) states that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the Act.

382.    By engaging in the conduct set forth above, Defendants have knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims within the meaning of § 3729.

383.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

384.    By reason of Defendants' acts the United States has suffered actual damages.

## COUNT TEN
**False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**Improper Retention of Government Health Plan Overpayment / Reverse False Claim**

385.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

386.    31 U.S.C. § 3729(a)(1)(G), imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

387.     Defendants knew, both upon receiving payment for each of the above-described false claims and when Relator pointed out the false claims to Defendants O'Hashi and Bennet as well as to Administrators Joanne Becker and Tyler Artz, throughout late 2018 and early 2019, that Defendant UIHC needed to reverse the claims previously submitted to the Government for payment, but it did not do so.

388.     Through the acts described above, Defendants knowingly concealed money that was owed to the Government when Defendants failed to return to the Government payment received for medications which Defendants knew were not eligible for reimbursement under Medicare program or were overpayments.

389.     By reason of Defendants' acts the United States has suffered actual damages.


## X.     PRAYER FOR RELIEF

WHEREFORE, Relator, the United States, and the State of Iowa are entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733, and Iowa Code Ann. §§ 685.1-.7.  Plaintiff/Relator requests that judgment be entered against Defendants, including that:

   a.   Defendants cease and desist from violating the False Claims Act, 31 U.S.C.
        §§ 3729 *et seq.;*

   b.   Defendants pay an amount equal to three times the amount of damages the
        United States and the State of Iowa has sustained because of Defendants'
        actions, plus a civil penalty against Defendants of not less than $10,957 and

not more than $21,916 for each violation of 31 U.S.C. § 3729 committed on

or before November 2, 2015; and not less than $11,181 and not more than

$22,363 for each violation of 31 U.S.C. § 3729 committed after November 2,

2015 pursuant to § 3729 (a)(1) and 28 C.F.R. § 85.5 or as may be further

adjusted and allowed under the Iowa False Claims Act, Iowa Code Ann.

§ 685.2;

c. Plaintiff/Relator be awarded the maximum amount allowed as a Relator share

pursuant to 31 U.S.C. § 3730(d);

d. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees,

expenses, and costs pursuant to 31 U.S.C. § 3730(d);

e. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees,

expenses, and costs pursuant to available under the Iowa False Claims Act,

Iowa Code Ann. §§ 685.1-.7;

f. Plaintiff/Relator be awarded the maximum amount allowed as a Relator share

as well as reasonable attorneys' fees and costs pursuant to Iowa Code Ann.

§§ 685.1-.7;

g. The United States, Iowa, and Plaintiff/Relator be granted all such other relief

as the Court deems just and proper.


**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE
ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Respectfully submitted and dated this 28th day of October 2019.

Cross Law Firm, S.C.
**Attorneys for Relator Richard Rezko**

By:  /s/ Nola J. Hitchcock Cross
     Nola J. Hitchcock Cross
     Wisconsin Bar No. 1015817
     (admitted Pro Hac Vice)

Nola J. Hitchcock Cross
**Cross Law Firm, S.C.**
Lawyer's Building, 845 North 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055
Email: njhcross@crosslawfirm.com

Angela Campbell
**Dickey & Campbell Law Firm, P.L.C.**
301 E Walnut Street, Suite 1
Des Moines, IA 50309
Phone: (515) 288-5008
Fax:    (515) 288-5010
Email: angela@dickeycampbell.com